## *PRELIMINARY PRINT*

## VOLUME 600 U. S. PART 1
### PAGES 477–550

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 30, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## BIDEN, PRESIDENT OF THE UNITED STATES, ET AL. *v.* NEBRASKA ET AL.

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 22–506.   Argued February 28, 2023—Decided June 30, 2023

Title IV of the Higher Education Act of 1965 (Education Act) governs federal financial aid mechanisms, including student loans.   20 U. S. C. § 1070(a).   The Act authorizes the Secretary of Education to cancel or reduce loans in certain limited circumstances.   The Secretary may cancel a set amount of loans held by some public servants, see §§ 1078–10, 1087j, 1087ee.   He may also forgive the loans of borrowers who have died or become "permanently and totally disabled," § 1087(a)(1); borrowers who are bankrupt, § 1087(b); and borrowers whose schools falsely certify them, close down, or fail to pay lenders, § 1087(c).

The issue presented in this case is whether the Secretary has authority under the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act) to depart from the existing provisions of the Education Act and establish a student loan forgiveness program that will cancel about $430 billion in debt principal and affect nearly all borrowers.   Under the HEROES Act, the Secretary "may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency."   § 1098bb(a)(1).   As relevant here, the Secretary may issue such waivers or modifications only "as may be necessary to ensure" that "recipients of student financial assistance under title IV of the [Education Act affected by a national emergency] are not placed in a worse position financially in relation to that financial assistance because of [the national emergency]."   §§ 1098bb(a)(2)(A), 1098ee(2)(C)–(D).

In 2022, a few weeks before President Biden stated that "the [COVID–19] pandemic is over," the Secretary invoked the HEROES Act to issue "waivers and modifications" reducing or eliminating the federal student debt of most borrowers.   Borrowers with eligible federal student loans who had an income below $125,000 in either 2020 or 2021 qualified for a loan balance discharge of up to $10,000.   Those who previously received Pell Grants—a specific type of federal student loan based on financial need—qualified for a discharge of up to $20,000.

Six States challenged the plan as exceeding the Secretary's statutory authority. The Eighth Circuit issued a nationwide preliminary injunction, and this Court granted certiorari before judgment.

*Held*:

1. At least Missouri has standing to challenge the Secretary's program. Article III requires a plaintiff to have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561. Here, as the Government concedes, the Secretary's plan would cost MOHELA, a nonprofit government corporation created by Missouri to participate in the student loan market, an estimated $44 million a year in fees. MOHELA is, by law and function, an instrumentality of Missouri: Labeled an "instrumentality" by the State, it was created by the State, is supervised by the State, and serves a public function. The harm to MOHELA in the performance of its public function is necessarily a direct injury to Missouri itself. The Court reached a similar conclusion 70 years ago in *Arkansas* v. *Texas*, 346 U. S. 368.

The Secretary emphasizes that, as a public corporation, MOHELA has a legal personality separate from the State. But such an instrumentality—created and supervised by the State to serve a public function—remains "(for many purposes at least) part of the Government itself." *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 397. The Secretary also contends that because MOHELA can sue on its own behalf, it—not Missouri—must be the one to sue. But where a State has been harmed in carrying out its responsibilities, the fact that it chose to exercise its authority through a public corporation it created and controls does not bar the State from suing to remedy that harm itself. See *Arkansas*, 346 U. S. 368. With Article III satisfied, the Court need not consider the States' other standing arguments. Pp. 489–494.

2. The HEROES Act allows the Secretary to "waive or modify" existing statutory or regulatory provisions applicable to financial assistance programs under the Education Act, but does not allow the Secretary to rewrite that statute to the extent of canceling $430 billion of student loan principal. Pp. 494–507.

(a) The text of the HEROES Act does not authorize the Secretary's loan forgiveness program. The Secretary's power under the Act to "modify" does not permit "basic and fundamental changes in the scheme" designed by Congress. *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 225. Instead, "modify" carries "a connotation of increment or limitation," and must

be read to mean "to change moderately or in minor fashion." *Ibid.* That is how the word is ordinarily used and defined, and the legal definition is no different.

The authority to "modify" statutes and regulations allows the Secretary to make modest adjustments and additions to existing provisions, not transform them. Prior to the COVID–19 pandemic, "modifications" issued under the Act were minor and had limited effect. But the "modifications" challenged here create a novel and fundamentally different loan forgiveness program. While Congress specified in the Education Act a few narrowly delineated situations that could qualify a borrower for loan discharge, the Secretary has extended such discharge to nearly every borrower in the country. It is "highly unlikely that Congress" authorized such a sweeping loan cancellation program "through such a subtle device as permission to 'modify.'" *Id.*, at 231.

The Secretary responds that the Act authorizes him to "waive" legal provisions as well as modify them—and that this additional term "grant[s] broader authority" than would "modify" alone. But the Secretary's invocation of the waiver power here does not remotely resemble how it has been used on prior occasions, where it was simply used to nullify particular legal requirements. The Secretary next argues that the power to "waive or modify" is greater than the sum of its parts: Because waiver allows the Secretary "to eliminate legal obligations in their entirety," the combination of "waive or modify" must allow him "to reduce them to any extent short of waiver" (even if the power to "modify" ordinarily does not stretch that far). But the challenged loan forgiveness program goes beyond even that. In essence, the Secretary has drafted a new section of the Education Act from scratch by "waiving" provisions root and branch and then filling the empty space with radically new text.

The Secretary also cites a procedural provision in the HEROES Act directing the Secretary to publish a notice in the Federal Register, "includ[ing] the terms and conditions to be applied in lieu of such statutory and regulatory provisions" as the Secretary has waived or modified. § 1098bb(b)(2). In the Government's view, that language authorizes both "waiving and then putting [the Secretary's] own requirements in"—a sort of "red penciling" of the existing law. But rather than implicitly granting the Secretary authority to draft new substantive statutory provisions at will, § 1098bb(b)(2) simply imposes the obligation to report any waivers and modifications he has made. The Secretary's ability to add new terms "in lieu of" the old is limited to his authority to "modify" existing law. As with any other modification issued under the Act, no new term or condition reported pursuant to § 1098bb(b)(2) may distort the fundamental nature of the provision it alters.

In sum, the Secretary's comprehensive debt cancellation plan is not a waiver because it augments and expands existing provisions dramatically. It is not a modification because it constitutes "effectively the introduction of a whole new regime." *MCI*, 512 U. S., at 234. And it cannot be some combination of the two, because when the Secretary seeks to *add* to existing law, the fact that he has "waived" certain provisions does not give him a free pass to avoid the limits inherent in the power to "modify." However broad the meaning of "waive or modify," that language cannot authorize the kind of exhaustive rewriting of the statute that has taken place here. Pp. 494–500.

(b) The Secretary also appeals to congressional purpose, arguing that Congress intended "to grant substantial discretion to the Secretary to respond to unforeseen emergencies." On this view, the unprecedented nature of the Secretary's debt cancellation plan is justified by the pandemic's unparalleled scope. But the question here is not whether something should be done; it is who has the authority to do it. As in the Court's recent decision in *West Virginia* v. *EPA*, given the "'history and the breadth of the authority'" asserted by the Executive and the "'economic and political significance' of that assertion," the Court has "'reason to hesitate before concluding that Congress' meant to confer such authority." 597 U. S. ——, —— (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160).

This case implicates many of the factors present in past cases raising similar separation of powers concerns. The Secretary has never previously claimed powers of this magnitude under the HEROES Act; "no regulation premised on" the HEROES Act "has even begun to approach the size or scope" of the Secretary's program. *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ——, —— (*per curiam*). The "'economic and political significance'" of the Secretary's action is staggering. *West Virginia*, 597 U. S., at —— (quoting *Brown & Williamson*, 529 U. S., at 160). And the Secretary's assertion of administrative authority has "conveniently enabled [him] to enact a program" that Congress has chosen not to enact itself. *West Virginia*, 597 U. S., at ——. The Secretary argues that the principles explained in *West Virginia* and its predecessors should not apply to cases involving government benefits. But major questions cases "have arisen from all corners of the administrative state," *id.*, at ——, and this is not the first such case to arise in the context of government benefits. See *King* v. *Burwell*, 576 U. S. 473, 485.

All this leads the Court to conclude that "[t]he basic and consequential tradeoffs" inherent in a mass debt cancellation program "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U. S., at ——. In such circumstances, the Court has required the Secretary to "point to 'clear congressional authorization'" to justify the chal-

lenged program. *Id.*, at ——, —— (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324). And as explained, the HEROES Act provides no authorization for the Secretary's plan when examined using the ordinary tools of statutory interpretation—let alone "clear congressional authorization" for such a program. Pp. 500–506.

Reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. BARRETT, J., filed a concurring opinion, *post*, p. 507. KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined, *post*, p. 521.

*Solicitor General Prelogar* argued the cause for petitioners. With her on the briefs were *Principal Deputy Assistant Attorney General Boynton, Deputy Solicitor General Fletcher, Vivek Suri, Yaira Dubin, Michael S. Raab, Thomas Pulham*, and *Brian Siegel*.

*James A. Campbell*, Solicitor General of Nebraska, argued the cause for respondents. With him on the brief were *Michael T. Hilgers,* Attorney General of Nebraska, and *Christian Edmonds,* Assistant Solicitor General, *Andrew Bailey*, Attorney General of Missouri, and *Michael E. Talent*, Deputy Solicitor General, *Tim Griffin,* Attorney General of Arkansas, *Nicholas J. Bronni*, Solicitor General, and *Dylan L. Jacobs,* Deputy Solicitor General, *Brenna Bird,* Attorney General of Iowa, and *Samuel P. Langholz,* Deputy Attorney General, *Kris Kobach,* Attorney General of Kansas, and*Dwight Carswell*, Deputy Solicitor General, *Alan Wilson*, Attorney General of South Carolina, and *J. Emory Smith, Jr.*, Deputy Solicitor General.*

---

*Briefs of *amici curiae* urging reversal were filed for the Americans for Prosperity Foundation et al. by *J. Marc Wheat, Michael Pepson,* and *Cynthia Fleming Crawford*; for the Empire Center for Public Policy, Inc., et al. by *Misha Tseytlin* and *Timothy L. McHugh*; for the Foundation for Government Accountability by *Stewart L. Whitson*; for the Hamilton Lincoln Law Institute et al. by *Theodore H. Frank* and *Curt A. Levey*; for the National Education Association by *Alice O'Brien* and *Jeffrey W. Burritt*; and for Jed Handelsman Shugerman by *Brian H. Pandya*. Briefs of *amici curiae* urging vacatur were filed for ArchCity Defenders et al. by *Seth E. Mermin*; for the Cato Institute et al. by *Anastasia P. Boden* and

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

To ensure that Americans could keep up with increasing international competition, Congress authorized the first fed-

*Ilya Shapiro*; for Six Veterans' Organizations by *Boris Bershteyn*; for Student Loan Experts by *Christopher J. Wright* and *Stephen W. Miller*; for Sen. Marsha Blackburn et al. by *Steven A. Engel* and *Michael H. McGinley*; for Elisabeth DeVos et al. by *Alexander Akerman*; and for Michael W. McConnell et al. by *William R. Levi.*

Briefs of *amici curiae* urging affirmance were filed for the State of Utah et al. by *Sean D. Reyes*, Attorney General of Utah, and *Melissa Holyoak*, Solicitor General, by *Dave Yost*, Attorney General of Ohio, *Benjamin M. Flowers*, Solicitor General, and *Sylvia May Mailman*, Deputy Solicitor General, and by the Attorneys General for their respective States as follows: *Steve Marshall* of Alabama, *Treg R. Taylor* of Alaska, *Ashley Moody* of Florida, *Christopher M. Carr* of Georgia, *Raúl Labrador* of Idaho, *Theodore E. Rokita* of Indiana, *Jeff Landry* of Louisiana, *Lynn Fitch* of Mississippi, *Austin Knudsen* of Montana, *John M. Formella* of New Hampshire, *Gentner Drummond* of Oklahoma, *Jonathan Skrmetti* of Tennessee, *Ken Paxton* of Texas, *Patrick Morrisey* of West Virginia, and *Bridget Hill* of Wyoming; for the American Center for Law and Justice by *Jay Alan Sekulow, Stuart J. Roth, Colby M. May, Jordan A. Sekulow,* and *Laura B. Hernandez*; for Borrower Advocacy and Legal Aid Organizations by *Joshua Rovenger* and *Persis Yu*; for Citizens United et al. by *William J. Olson, Jeremiah L. Morgan, Robert J. Olson, Michael Boos,* and *Daniel H. Jorjani*; for Legal Scholars by *Jeffrey B. Dubner* and *Sean A. Lev*; for the Liberty Justice Center by *Daniel R. Suhr*; for Local Governments by *Jonathan B. Miller, Joshua A. Rosenthal, Atleen Kaur, Mark Griffin, Arturo G. Michel, James D. Smiertka, Peter M. Bollinger, Leslie J. Girard, John P. Markovs, Diana P. Cortes, Sheena Hamilton, Lyndsey M. Olson,* and *Ronald A. Hope*; for Samuel L. Bray et al. by *Melissa Arbus Sherry*; for Howard McKeon et al. by *Caleb Kruckenberg*; and for 128 U. S. Representatives et al. by *Jennifer L. Mascott* and *R. Trent McCotter.*

Briefs of *amici curiae* were filed for the Commonwealth of Massachusetts et al. by *Elizabeth N. Dewar*, Acting Attorney General of Massachusetts, and *Yael Shavit*, Assistant Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *Rob Bonta* of California, *Philip J. Weiser* of Colorado, *William Tong* of Connecticut, *Kathleen Jennings* of Delaware, *Brian L. Schwalb* of the District of Columbia, *Anne E. Lopez* of Hawaii, *Kwame Raoul* of Illinois, *Anthony G. Brown* of Maryland, *Dana Nessel* of Michigan, *Keith Ellison* of Minnesota, *Aaron D. Ford* of Nevada, *Matthew J. Platkin* of New Jersey, *Raúl Torrez* of New Mexico,

eral student loans in 1958—up to a total of $1,000 per student each year.   National Defense Education Act of 1958, 72 Stat. 1584.   Outstanding federal student loans now total $1.6 trillion extended to 43 million borrowers.   Letter from Congressional Budget Office to Members of Congress, p. 3 (Sept. 26, 2022) (CBO Letter).   Last year, the Secretary of Education established the first comprehensive student loan forgiveness program, invoking the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act) for authority to do so.   The Secretary's plan canceled roughly $430 billion of federal student loan balances, completely erasing the debts of 20 million borrowers and lowering the median amount owed by the other 23 million from $29,400 to $13,600.   See *ibid.*; App. 243.   Six States sued, arguing that the HEROES Act does not authorize the loan cancellation plan.   We agree.

## I

### A

The Higher Education Act of 1965 (Education Act) was enacted to increase educational opportunities and "assist in

*Letitia James* of New York, *Joshua H. Stein* of North Carolina, *Ellen F. Rosenblum* of Oregon, *Josh Shapiro* of Pennsylvania, *Peter F. Neronha* of Rhode Island, *Charity R. Clark* of Vermont, *Robert W. Ferguson* of Washington, and *Joshua L. Kaul* of Wisconsin; for the America First Policy Institute by *Craig W. Trainor* and *Rachel Jag*; for the American Federation of Teachers et al. by *Yelena Konanova*, *Faith E. Gay*, and *Max H. Siegel*; for the Atlantic Legal Foundation by *Lawrence S. Ebner*; for the Buckeye Institute by *David C. Tryon* and *Robert Alt*; for the Chamber of Commerce of the United States of America by *Robert E. Dunn*, *Amy Miller*, and *Jennifer B. Dickey*; for the Landmark Legal Foundation by *Michael J. O'Neill*, *Matthew C. Forys*, and *Richard P. Hutchison*; for the Lawyers' Committee for Civil Rights Under Law et al. by *Damon Hewitt*, *Jon Greenbaum*, *David Hinojosa*, and *Genevieve Bonadies Torres*; for the NAACP by *Andrew D. Silverman*; for the New Civil Liberties Alliance by *Markham S. Chenoweth* and *Russell G. Ryan*; for the Protect Democracy Project by *Justin Florence* and *Genevieve Nadeau*; for George Miller by *Elizabeth B. Wydra* and *Brianne J. Gorod*; and for Lawrence A. Stein by *Mr. Stein, pro se.*

making available the benefits of postsecondary education to eligible students . . . in institutions of higher education." 20 U. S. C. § 1070(a). To that end, Title IV of the Act restructured federal financial aid mechanisms and established three types of federal student loans. Direct Loans are, as the name suggests, made directly to students and funded by the federal fisc; they constitute the bulk of the Federal Government's student lending efforts. See § 1087a *et seq.* The Government also administers Perkins Loans—government-subsidized, low-interest loans made by schools to students with significant financial need—and Federal Family Education Loans, or FFELs—loans made by private lenders and guaranteed by the Federal Government. See §§ 1071 *et seq.*, 1087aa *et seq.* While FFELs and Perkins Loans are no longer issued, many remain outstanding. §§ 1071(d), 1087aa(b).

The terms of federal loans are set by law, not the market, so they often come with benefits not offered by private lenders. Such benefits include deferment of any repayment until after graduation, loan qualification regardless of credit history, relatively low fixed interest rates, income-sensitive repayment plans, and—for undergraduate students with financial need—government payment of interest while the borrower is in school. Dept. of Ed., Federal Student Aid, Federal Versus Private Loans.

The Education Act specifies in detail the terms and conditions attached to federal loans, including applicable interest rates, loan fees, repayment plans, and consequences of default. See §§ 1077, 1080, 1087e, 1087dd. It also authorizes the Secretary to cancel or reduce loans, but only in certain limited circumstances and to a particular extent. Specifically, the Secretary can cancel a set amount of loans held by some public servants—including teachers, members of the Armed Forces, Peace Corps volunteers, law enforcement and corrections officers, firefighters, nurses, and librarians—who work in their professions for a minimum number of years.

§§ 1078–10, 1087j, 1087ee. The Secretary can also forgive the loans of borrowers who have died or been "permanently and totally disabled," such that they cannot "engage in any substantial gainful activity." § 1087(a)(1). Bankrupt borrowers may have their loans forgiven. § 1087(b). And the Secretary is directed to discharge loans for borrowers falsely certified by their schools, borrowers whose schools close down, and borrowers whose schools fail to pay loan proceeds they owe to lenders. § 1087(c).

Shortly after the September 11 terrorist attacks, Congress became concerned that borrowers affected by the crisis—particularly those who served in the military—would need additional assistance. As a result, it enacted the Higher Education Relief Opportunities for Students Act of 2001. That law provided the Secretary of Education, for a limited period of time, with "specific waiver authority to respond to conditions in the national emergency" caused by the September 11 attacks. 115 Stat. 2386. Rather than allow this grant of authority to expire by its terms at the end of September 2003, Congress passed the Higher Education Relief Opportunities for Students Act of 2003 (HEROES Act). 117 Stat. 904. That Act extended the coverage of the 2001 statute to include any war or national emergency—not just the September 11 attacks. By its terms, the Secretary "may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency." 20 U. S. C. § 1098bb(a)(1).[1]

———————

[1] Like its 2001 predecessor, the HEROES Act enjoyed virtually unanimous bipartisan support at the time of its enactment, passing by a 421-to-1 vote in the House of Representatives and a unanimous voice vote in the Senate. See 149 Cong. Rec. 7952–7953 (2003); *id.*, at 20809; 147 Cong. Rec. 20396 (2001); *id.*, at 26292–26293. The single dissenting Representative later voiced his support for the Act, explaining that he "meant to vote 'yea.'" 149 Cong. Rec. 8559 (statement of Rep. Miller).

The Secretary may issue waivers or modifications only "as may be necessary to ensure" that "recipients of student financial assistance under title IV of the [Education Act] who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." §1098bb(a)(2)(A). An "affected individual" is defined, in relevant part, as someone who "resides or is employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as determined by the Secretary." §§1098ee(2)(C)–(D). And a "national emergency" for the purposes of the Act is "a national emergency declared by the President of the United States." §1098ee(4).

Immediately following the passage of the Act in 2003, the Secretary issued two dozen waivers and modifications addressing a handful of specific issues. 68 Fed. Reg. 69312–69318. Among other changes, the Secretary waived the requirement that "affected individuals" must "return or repay an overpayment" of certain grant funds erroneously disbursed by the Government, *id.*, at 69314, and the requirement that public service work must be uninterrupted to qualify an "affected individual" for loan cancellation, *id.*, at 69317. Additional adjustments were made in 2012, with similar limited effects. 77 Fed. Reg. 59311–59318.

But the Secretary took more significant action in response to the COVID–19 pandemic. On March 13, 2020, the President declared the pandemic a national emergency. Presidential Proclamation No. 9994, 85 Fed. Reg. 15337–15338 (2020). One week later, then-Secretary of Education Betsy DeVos announced that she was suspending loan repayments and interest accrual for all federally held student loans. See Dept. of Ed., Breaking News: Testing Waivers and Student Loan Relief (Mar. 20, 2020). The following week, Congress enacted the Coronavirus Aid, Relief, and Economic Security

Act, which required the Secretary to extend the suspensions through the end of September 2020.  134 Stat. 404–405. Before that extension expired, the President directed the Secretary, "[i]n light of the national emergency," to "effectuate appropriate waivers of and modifications to" the Education Act to keep the suspensions in effect through the end of the year.  85 Fed. Reg. 49585.  And a few months later, the Secretary further extended the suspensions, broadened eligibility for federal financial assistance, and waived certain administrative requirements (to allow, for example, virtual rather than on-site accreditation visits and to extend deadlines for filing reports).  *Id.*, at 79856–79863; 86 Fed. Reg. 5008–5009 (2021).

Over a year and a half passed with no further action beyond keeping the repayment and interest suspensions in place.  But in August 2022, a few weeks before President Biden stated that "the pandemic is over," the Department of Education announced that it was once again issuing "waivers and modifications" under the Act—this time to reduce and eliminate student debts directly.  See App. 257–259; Washington Post, Sept. 20, 2022, p. A3, col. 1.  During the first year of the pandemic, the Department's Office of General Counsel had issued a memorandum concluding that "the Secretary does not have statutory authority to provide blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances."  Memorandum from R. Rubinstein to B. DeVos, p. 8 (Jan. 12, 2021).  After a change in Presidential administrations and shortly before adoption of the challenged policy, however, the Office of General Counsel "formally rescinded" its earlier legal memorandum and issued a replacement reaching the opposite conclusion.  87 Fed. Reg. 52945 (2022).  The new memorandum determined that the HEROES Act "grants the Secretary authority that could be used to effectuate a program of targeted loan cancellation directed at addressing the financial harms of the COVID–19 pandemic."  *Id.*, at 52944.  Upon receiving this

new opinion, the Secretary issued his proposal to cancel student debt under the HEROES Act. App. 257–259. Two months later, he published the required notice of his "waivers and modifications" in the Federal Register. 87 Fed. Reg. 61512–61514.

The terms of the debt cancellation plan are straightforward: For borrowers with an adjusted gross income below $125,000 in either 2020 or 2021 who have eligible federal loans, the Department of Education will discharge the balance of those loans in an amount up to $10,000 per borrower.[2] *Id.*, at 61514 ("modif[ying] the provisions of" 20 U. S. C. §§ 1087, 1087dd(g); 34 CFR pt. 647, subpt. D (2022); 34 CFR §§ 682.402, 685.212). Borrowers who previously received Pell Grants qualify for up to $20,000 in loan cancellation. 87 Fed. Reg. 61514. Eligible loans include "Direct Loans, FFEL loans held by the Department or subject to collection by a guaranty agency, and Perkins Loans held by the Department." *Ibid.* The Department of Education estimates that about 43 million borrowers qualify for relief, and the Congressional Budget Office estimates that the plan will cancel about $430 billion in debt principal. See App. 119; CBO Letter 3.

B

Six States moved for a preliminary injunction, claiming that the plan exceeded the Secretary's statutory authority. The District Court held that none of the States had standing to challenge the plan and dismissed the suit. 636 F. Supp. 3d 991 (ED Mo. 2022). The States appealed, and the Eighth Circuit issued a nationwide preliminary injunction pending resolution of the appeal. The court concluded that Missouri likely had standing through the Missouri Higher Education Loan Authority (MOHELA or Authority), a public corpora-

---

[2] A borrower filing "jointly or as a Head of Household, or as a qualifying widow(er)," qualifies for loan cancellation with an adjusted gross income lower than $250,000. 87 Fed. Reg. 61514.

tion that holds and services student loans. 52 F. 4th 1044 (2022). It further concluded that the State's challenge raised "substantial" questions on the merits and that the equities favored maintaining the status quo pending further review. *Id.*, at 1048 (internal quotation marks omitted).

With the plan on pause, the Secretary asked this Court to vacate the injunction or to grant certiorari before judgment, "to avoid prolonging this uncertainty for the millions of affected borrowers." Application 4. We granted the petition and set the case for expedited argument. 598 U. S. —— (2022).

## II

Before addressing the legality of the Secretary's program, we must first ensure that the States have standing to challenge it. Under Article III of the Constitution, a plaintiff needs a "personal stake" in the case. *TransUnion LLC* v. *Ramirez*, 594 U. S. ——, —— (2021). That is, the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992). If at least one plaintiff has standing, the suit may proceed. *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 52, n. 2 (2006). Because we conclude that the Secretary's plan harms MOHELA and thereby directly injures Missouri—conferring standing on that State—we need not consider the other theories of standing raised by the States.

Missouri created MOHELA as a nonprofit government corporation to participate in the student loan market. Mo. Rev. Stat. § 173.360 (2016). The Authority owns over $1 billion in FFELs. MOHELA, FY 2022 Financial Statement 9 (Financial Statement). It also services nearly $150 billion worth of federal loans, having been hired by the Department of Education to collect payments and provide customer service to borrowers. *Id.*, at 4, 8. MOHELA receives an ad-

ministrative fee for each of the five million federal accounts it services, totaling $88.9 million in revenue last year alone. *Ibid.*

Under the Secretary's plan, roughly half of all federal borrowers would have their loans completely discharged. App. 119. MOHELA could no longer service those closed accounts, costing it, by Missouri's estimate, $44 million a year in fees that it otherwise would have earned under its contract with the Department of Education. Brief for Respondents 16. This financial harm is an injury in fact directly traceable to the Secretary's plan, as both the Government and the dissent concede. See Tr. of Oral Arg. 18; *post*, at 525 (KAGAN, J., dissenting).

The plan's harm to MOHELA is also a harm to Missouri. MOHELA is a "public instrumentality" of the State. Mo. Rev. Stat. § 173.360. Missouri established the Authority to perform the "essential public function" of helping Missourians access student loans needed to pay for college. *Ibid.*; see *Todd* v. *Curators of University of Missouri*, 347 Mo. 460, 464, 147 S. W. 2d 1063, 1064 (1941) ("Our constitution recognizes higher education as a governmental function."). To fulfill this public purpose, the Authority is empowered by the State to invest in or finance student loans, including by issuing bonds. §§ 173.385(1)(6)–(7). It may also service loans and collect "reasonable fees" for doing so. §§ 173.385(1)(12), (18). Its profits help fund education in Missouri: MOHELA has provided $230 million for development projects at Missouri colleges and universities and almost $300 million in grants and scholarships for Missouri students. Financial Statement 10, 20.

The Authority is subject to the State's supervision and control. Its board consists of two state officials and five members appointed by the Governor and approved by the Senate. § 173.360. The Governor can remove any board member for cause. *Ibid.* MOHELA must provide annual financial reports to the Missouri Department of Education,

detailing its income, expenditures, and assets. §173.445. The Authority is therefore "directly answerable" to the State. *Casualty Reciprocal Exchange* v. *Missouri Employers Mut. Ins. Co.*, 956 S. W. 2d 249, 254 (Mo. 1997). The State "set[s] the terms of its existence," and only the State "can abolish [MOHELA] and set the terms of its dissolution." *Id.*, at 254–255.

By law and function, MOHELA is an instrumentality of Missouri: It was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State. The Secretary's plan will cut MOHELA's revenues, impairing its efforts to aid Missouri college students. This acknowledged harm to MOHELA in the performance of its public function is necessarily a direct injury to Missouri itself.

We came to a similar conclusion 70 years ago in *Arkansas* v. *Texas*, 346 U. S. 368 (1953). Arkansas sought to invoke our original jurisdiction in a suit against Texas, claiming that Texas had wrongfully interfered with a contract between the University of Arkansas and a Texas charity. *Id.*, at 369. Texas argued that the suit could not proceed because the University did "not stand in the shoes of the State." *Id.*, at 370. The harm to the University, as Texas saw it, was not a harm to Arkansas sufficient for the State to sue in its own name.

We disagreed. We recognized that "Arkansas must, of course, represent an interest of her own and not merely that of her citizens or corporations." *Ibid.* But we concluded that Arkansas was in fact seeking to protect its *own* interests because the University was "an official state instrumentality." *Ibid.* The State had labeled the University "an instrument of the state in the performance of a governmental work." *Ibid.* (internal quotation marks omitted). The University served a public purpose, acting as the State's "agen[t] in the educational field." *Id.*, at 371. The University had

been "created by the Arkansas legislature," was "governed by a Board of Trustees appointed by the Governor with consent of the Senate," and "report[ed] all of its expenditures to the legislature." *Id.*, at 370. In short, the University was an instrumentality of the State, and "any injury under the contract to the University [was] an injury to Arkansas." *Ibid.* So too here. Because the Authority is part of Missouri, the State does not seek to "rely on injuries suffered by others." *Post*, at 522–523 (opinion of KAGAN, J.). It aims to remedy its own.

The Secretary and the dissent assert that MOHELA's injuries should not count as Missouri's because MOHELA, as a public corporation, has a legal personality separate from the State. Every government corporation has such a distinct personality; it is a corporation, after all, "with the powers to hold and sell property and to sue and be sued." *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 624 (1983). Yet such an instrumentality—created and operated to fulfill a public function—nonetheless remains "(for many purposes at least) part of the Government itself." *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 397 (1995).

In *Lebron*, Amtrak was sued for refusing to display a political advertisement on a billboard at one of its stations. *Id.*, at 376–377. Amtrak argued that it was not subject to the First Amendment because it was a corporation separate from the Federal Government. See *id.*, at 392. Congress had even specified in its authorizing statute that Amtrak was not "an agency or establishment of the United States Government." *Id.*, at 391 (quoting 84 Stat. 1330). Despite this disclaimer, we held that Amtrak remained subject to the First Amendment because it functioned as an instrumentality of the Federal Government, "created by a special statute, explicitly for the furtherance of federal governmental goals" of ensuring that the American public had access to passenger trains. *Lebron*, 513 U. S., at 397. Its board was appointed by the President, and it had to submit annual reports to the

President and Congress. *Id.*, at 385–386. Having been "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees," Amtrak could not disclaim that it was "part of the Government." *Id.*, at 398, 400.

We reiterated the point in *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43 (2015). There, railroads argued that giving Amtrak regulatory power was an unconstitutional delegation of government authority to a private entity. *Id.*, at 49–50. We rejected that contention, noting that "Amtrak was created by the Government, is controlled by the Government, and operates for the Government's benefit." *Id.*, at 53. It was therefore acting "as a governmental entity" in exercising that regulatory power. *Id.*, at 54.

That principle holds true here. The Secretary and the dissent contend that because MOHELA can sue on its own behalf, it—not Missouri—must be the one to sue. But in *Arkansas*, 346 U. S. 368, the University of Arkansas could have asserted its rights under the contract on its own. The University's governing statute made it "a body politic and corporate," with "all the powers of a corporate body," Ark. Stat. §80–2804 (1887)—including the power to sue and be sued on its own behalf, see *HRR Arkansas, Inc.* v. *River City Contractors, Inc.*, 350 Ark. 420, 427, 87 S. W. 3d 232, 237 (2002); see, *e. g., Board of Trustees, Univ. of Ark.* v. *Pulaski County*, 229 Ark. 370, 315 S. W. 2d 879 (1958). We permitted Arkansas to bring an original suit all the same. Where a State has been harmed in carrying out its responsibilities, the fact that it chose to exercise its authority through a public corporation it created and controls does not bar the State from suing to remedy that harm itself.[3]

_____

[3] The dissent, for all its attempts to cabin these precedents, cites no precedents of its own addressing a State's standing to sue for a harm to its instrumentality. The dissent offers only a state court case involving a different public corporation, in which the Missouri Supreme Court said

The Secretary's plan harms MOHELA in the performance of its public function and so directly harms the State that created and controls MOHELA. Missouri thus has suffered an injury in fact sufficient to give it standing to challenge the Secretary's plan. With Article III satisfied, we turn to the merits.

## III

The Secretary asserts that the HEROES Act grants him the authority to cancel $430 billion of student loan principal. It does not. We hold today that the Act allows the Secretary to "waive or modify" existing statutory or regulatory provisions applicable to financial assistance programs under the Education Act, not to rewrite that statute from the ground up.

## A

The HEROES Act authorizes the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency." 20 U. S. C. § 1098bb(a)(1). That power has limits. To begin with, statutory permission to "modify" does not authorize "basic and fundamental changes in the scheme" designed by Congress. *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 225 (1994). Instead, that term carries "a connotation of increment or limitation," and must be read to mean "to change moderately or in minor fashion." *Ibid.* That is how the word is ordinarily used. See, *e. g.*, Webster's Third New In-

---

that the corporation was separate from the State for the purposes of a state ban on "the lending of the credit of the state." *Menorah Medical Center* v. *Health and Ed. Facilities Auth.*, 584 S. W. 2d 73, 78 (1979) (plurality opinion). But as the dissent recognizes, a public corporation can count as part of the State for some but not "other purposes." *Post*, at 531, and n. 1. The Missouri Supreme Court said nothing about, and had no reason to address, whether an injury to that public corporation was a harm to the State.

ternational Dictionary 1952 (2002) (defining "modify" as "to make more temperate and less extreme," "to limit or restrict the meaning of," or "to make minor changes in the form or structure of [or] alter without transforming"). The legal definition is no different. Black's Law Dictionary 1203 (11th ed. 2019) (giving the first definition of "modify" as "[t]o make somewhat different; to make small changes to," and the second as "[t]o make more moderate or less sweeping"). The authority to "modify" statutes and regulations allows the Secretary to make modest adjustments and additions to existing provisions, not transform them.

The Secretary's previous invocations of the HEROES Act illustrate this point. Prior to the COVID–19 pandemic, "modifications" issued under the Act implemented only minor changes, most of which were procedural. Examples include reducing the number of tax forms borrowers are required to file, extending time periods in which borrowers must take certain actions, and allowing oral rather than written authorizations. See 68 Fed. Reg. 69314–69316.

Here, the Secretary purported to "modif[y] the provisions of" two statutory sections and three related regulations governing student loans. 87 Fed. Reg. 61514. The affected statutory provisions granted the Secretary the power to "discharge [a] borrower's liability," or pay the remaining principal on a loan, under certain narrowly prescribed circumstances. 20 U. S. C. §§ 1087, 1087dd(g)(1). Those circumstances were limited to a borrower's death, disability, or bankruptcy; a school's false certification of a borrower or failure to refund loan proceeds as required by law; and a borrower's inability to complete an educational program due to closure of the school. See §§ 1087(a)–(d), 1087dd(g). The corresponding regulatory provisions detailed rules and procedures for such discharges. They also defined the terms of the Government's public service loan forgiveness program and provided for discharges when schools commit malfeasance. See 34 CFR §§ 682.402, 685.212; 34 CFR pt. 674, subpt. D.

The Secretary's new "modifications" of these provisions were not "moderate" or "minor." Instead, they created a novel and fundamentally different loan forgiveness program. The new program vests authority in the Department of Education to discharge up to $10,000 for every borrower with income below $125,000 and up to $20,000 for every such borrower who has received a Pell Grant. 87 Fed. Reg. 61514. No prior limitation on loan forgiveness is left standing. Instead, every borrower within the specified income cap automatically qualifies for debt cancellation, no matter their circumstances. The Department of Education estimates that the program will cover 98.5% of all borrowers. See Dept. of Ed., White House Fact Sheet: The Biden Administration's Plan for Student Debt Relief Could Benefit Tens of Millions of Borrowers in All Fifty States (Sept. 20, 2022). From a few narrowly delineated situations specified by Congress, the Secretary has expanded forgiveness to nearly every borrower in the country.

The Secretary's plan has "modified" the cited provisions only in the same sense that "the French Revolution 'modified' the status of the French nobility"—it has abolished them and supplanted them with a new regime entirely. *MCI*, 512 U. S., at 228. Congress opted to make debt forgiveness available only in a few particular exigent circumstances; the power to modify does not permit the Secretary to "convert that approach into its opposite" by creating a new program affecting 43 million Americans and $430 billion in federal debt. *Descamps* v. *United States*, 570 U. S. 254, 274 (2013). Labeling the Secretary's plan a mere "modification" does not lessen its effect, which is in essence to allow the Secretary unfettered discretion to cancel student loans. It is "highly unlikely that Congress" authorized such a sweeping loan cancellation program "through such a subtle device as permission to 'modify.'" *MCI*, 512 U. S., at 231.

The Secretary responds that the Act authorizes him to "waive" legal provisions as well as modify them—and that

this additional term "grant[s] broader authority" than would "modify" alone. But the Secretary's invocation of the waiver power here does not remotely resemble how it has been used on prior occasions. Previously, waiver under the HEROES Act was straightforward: the Secretary identified a particular legal requirement and waived it, making compliance no longer necessary. For instance, on one occasion the Secretary waived the requirement that a student provide a written request for a leave of absence. See 77 Fed. Reg. 59314. On another, he waived the regulatory provisions requiring schools and guaranty agencies to attempt collection of defaulted loans for the time period in which students were affected individuals. See 68 Fed. Reg. 69316.

Here, the Secretary does not identify any provision that he is actually waiving.[4] No specific provision of the Education Act establishes an obligation on the part of student borrowers to pay back the Government. So as the Government concedes, "waiver"—as used in the HEROES Act—cannot refer to "waiv[ing] loan balances" or "waiving the obligation to repay" on the part of a borrower. Tr. of Oral Arg. 9, 64. Contrast 20 U. S. C. § 1091b(b)(2)(D) (allowing the Secretary to "waive the amounts that students are required to return" in specified circumstances of overpayment by the Government). Because the Secretary cannot waive a particular provision or provisions to achieve the desired result, he is forced to take a more circuitous approach, one that avoids any need to show compliance with the statutory limitation on his authority. He simply "waiv[es] the elements of the discharge and cancellation provisions that are inapplicable in this [debt cancellation] program that would limit eligibility to other contexts." Tr. of Oral Arg. 64–65.

---

[4] While the Secretary's notice published in the Federal Register refers to "waivers and modifications" generally, see 87 Fed. Reg. 61512–61514, and while two sentences use the somewhat ambiguous phrase "[t]his waiver," *id.*, at 61514, the notice identifies no specific legal provision as having been "waived" by the Secretary.

Yet even that expansive conception of waiver cannot justify the Secretary's plan, which does far more than relax existing legal requirements. The plan specifies particular sums to be forgiven and income-based eligibility requirements. The addition of these new and substantially different provisions cannot be said to be a "waiver" of the old in any meaningful sense. Recognizing this, the Secretary acknowledges that waiver alone is not enough; after waiving whatever "inapplicable" law would bar his debt cancellation plan, he says, he then "modif[ied] the provisions to bring [them] in line with this program." *Id.*, at 65. So in the end, the Secretary's plan relies on modifications all the way down. And as we have explained, the word "modify" simply cannot bear that load.

The Secretary and the dissent go on to argue that the power to "waive or modify" is greater than the sum of its parts. Because waiver allows the Secretary "to eliminate legal obligations in their entirety," the argument runs, the combination of "waive or modify" allows him "to reduce them to any extent short of waiver"—even if the power to "modify" ordinarily does not stretch that far. Reply Brief 16–17 (internal quotation marks omitted). But the Secretary's program cannot be justified by such sleight of hand. The Secretary has not truly waived or modified the provisions in the Education Act authorizing specific and limited forgiveness of student loans. Those provisions remain safely intact in the U. S. Code, where they continue to operate in full force. What the Secretary has actually done is draft a new section of the Education Act from scratch by "waiving" provisions root and branch and then filling the empty space with radically new text.

Lastly, the Secretary points to a procedural provision in the HEROES Act. The Act directs the Secretary to publish a notice in the Federal Register "includ[ing] *the terms and conditions to be applied in lieu of* such statutory and regulatory provisions" as the Secretary has waived or modified.

20 U. S. C. § 1098bb(b)(2) (emphasis added). In the Secretary's view, that language authorizes "both deleting and then adding back in, waiving and then putting his own requirements in"—a sort of "red penciling" of the existing law. Tr. of Oral Arg. 65; see also Reply Brief 17.

Section 1098bb(b)(2) is, however, "a wafer-thin reed on which to rest such sweeping power." *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ——, —— (2021) (*per curiam*). The provision is no more than it appears to be: a humdrum reporting requirement. Rather than implicitly granting the Secretary authority to draft new substantive statutory provisions at will, it simply imposes the obligation to report any waivers and modifications he has made. Section 1098bb(b)(2) suggests that "waivers and modifications" includes additions. The dissent accordingly reads the statute as authorizing any degree of change or any new addition, "from modest to substantial"—and nothing in the dissent's analysis suggests stopping at "substantial." *Post*, at 540. Because the Secretary "does not have to leave gaping holes" when he waives provisions, the argument runs, it follows that *any* replacement terms the Secretary uses to fill those holes must be lawful. *Ibid.* But the Secretary's ability to add new terms "in lieu of" the old is limited to his authority to "modify" existing law. As with any other modification issued under the Act, no new term or condition reported pursuant to § 1098bb(b)(2) may distort the fundamental nature of the provision it alters.[5]

The Secretary's comprehensive debt cancellation plan cannot fairly be called a waiver—it not only nullifies existing provisions, but augments and expands them dramatically. It cannot be mere modification, because it constitutes "effec-

———————

[5] The dissent asserts that our decision today will control any challenge to the Secretary's temporary suspensions of loan repayments and interest accrual. *Post*, at 541–542. We decide only the case before us. A challenge to the suspensions may involve different considerations with respect to both standing and the merits.

tively the introduction of a whole new regime." *MCI*, 512 U. S., at 234. And it cannot be some combination of the two, because when the Secretary seeks to *add* to existing law, the fact that he has "waived" certain provisions does not give him a free pass to avoid the limits inherent in the power to "modify." However broad the meaning of "waive or modify," that language cannot authorize the kind of exhaustive rewriting of the statute that has taken place here.[6]

## B

In a final bid to elide the statutory text, the Secretary appeals to congressional purpose. "The whole point of" the HEROES Act, the Government contends, "is to ensure that in the face of a national emergency that is causing financial harm to borrowers, the Secretary can do something." Tr. of Oral Arg. 55. And that "something" was left deliberately vague because Congress intended "to grant substantial discretion to the Secretary to respond to unforeseen emergencies." Reply Brief 22, n. 3. So the unprecedented nature of the Secretary's debt cancellation plan only "reflects the pandemic's unparalleled scope." Brief for Petitioners 52 (Brief for United States).

The dissent agrees. "Emergencies, after all, are emergencies," it reasons, and "more serious measures" must be expected "in response to more serious problems." *Post*, at 545, 547. The dissent's interpretation of the HEROES Act

---

[6] The States further contend that the Secretary's program violates the requirement in the HEROES Act that any waivers or modifications be "necessary to ensure that . . . affected individuals are not placed in a worse position financially in relation to" federal financial assistance. 20 U. S. C. § 1098bb(a)(2)(A); see Brief for Respondents 39–44. While our decision does not rest upon that reasoning, we note that the Secretary faces a daunting task in showing that cancellation of debt principal is "necessary to ensure" that borrowers are not placed in "worse position[s] financially in relation to" their loans, especially given the Government's prior determination that pausing interest accrual and loan repayments would achieve that end.

would grant unlimited power to the Secretary, not only to modify or waive certain provisions but to "fill the holes that action creates with new terms"—no matter how drastic those terms might be—and to "alter [provisions] to the extent [he] think[s] appropriate," up to and including "the most substantial kind of change" imaginable. *Post*, at 536, 539. That is inconsistent with the statutory language and past practice under the statute.

The question here is not whether something should be done; it is who has the authority to do it. Our recent decision in *West Virginia* v. *EPA* involved similar concerns over the exercise of administrative power. 597 U. S. —— (2022). That case involved the EPA's claim that the Clean Air Act authorized it to impose a nationwide cap on carbon dioxide emissions. Given "the 'history and the breadth of the authority that [the agency] ha[d] asserted,' and the 'economic and political significance' of that assertion," we found that there was "'reason to hesitate before concluding that Congress' meant to confer such authority." *Id.*, at —— (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160 (2000); first alteration in original).

So too here, where the Secretary of Education claims the authority, on his own, to release 43 million borrowers from their obligations to repay $430 billion in student loans. The Secretary has never previously claimed powers of this magnitude under the HEROES Act. As we have already noted, past waivers and modifications issued under the Act have been extremely modest and narrow in scope. The Act has been used only once before to waive or modify a provision related to debt cancellation: In 2003, the Secretary waived the requirement that borrowers seeking loan forgiveness under the Education Act's public service discharge provisions "perform uninterrupted, otherwise qualifying service for a specified length of time (for example, one year) or for consecutive periods of time, such as 5 consecutive years." 68 Fed. Reg. 69317. That waiver simply eased the require-

ment that service be uninterrupted to qualify for the public service loan forgiveness program. In sum, "no regulation premised on" the HEROES Act "has even begun to approach the size or scope" of the Secretary's program. *Alabama Assn.*, 594 U. S., at ——.[7]

Under the Government's reading of the HEROES Act, the Secretary would enjoy virtually unlimited power to rewrite the Education Act. This would "effec[t] a 'fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation' into an entirely different kind," *West Virginia*, 597 U. S., at —— (quoting *MCI*, 512 U. S., at 231)—one in which the Secretary may unilaterally define every aspect of federal student financial aid, provided he determines that recipients have "suffered direct economic hardship as a direct result of a . . . national emergency." 20 U. S. C. § 1098ee(2)(D).

The "'economic and political significance'" of the Secretary's action is staggering by any measure. *West Virginia*, 597 U. S., at —— (quoting *Brown & Williamson*, 529 U. S., at 160). Practically every student borrower benefits, regardless of circumstances. A budget model issued by the Wharton School of the University of Pennsylvania estimates that the program will cost taxpayers "between $469 billion and $519 billion," depending on the total number of borrowers ultimately covered. App. 108. That is ten times the "economic impact" that we found significant in concluding that an eviction moratorium implemented by the Centers for Disease Control and Prevention triggered analysis under the

---

[7] The Secretary also cites a prior invocation of the HEROES Act waiving the requirement that borrowers must repay prior overpayments of certain grant funds. See Brief for United States 41; 68 Fed. Reg. 69314. But Congress had already limited borrower liability in such cases to exclude overpayments in amounts up to "50 percent of the total grant assistance received by the student" for the period at issue, so the Secretary's waiver had only a modest effect. 20 U. S. C. § 1091b(b)(2)(C)(i)(II). And that waiver simply held the Government responsible for its *own* errors when it had mistakenly disbursed undeserved grant funds.

major questions doctrine. *Alabama Assn.*, 594 U. S., at ——.
It amounts to nearly one-third of the Government's $1.7 tril-
lion in annual discretionary spending. Congressional Bud-
get Office, The Federal Budget in Fiscal Year 2022. There
is no serious dispute that the Secretary claims the authority
to exercise control over "a significant portion of the Ameri-
can economy." *Utility Air Regulatory Group* v. *EPA*, 573
U. S. 302, 324 (2014) (quoting *Brown & Williamson*, 529
U. S., at 159).

The dissent is correct that this is a case about one branch
of government arrogating to itself power belonging to an-
other. But it is the Executive seizing the power of the Leg-
islature. The Secretary's assertion of administrative au-
thority has "conveniently enabled [him] to enact a program"
that Congress has chosen not to enact itself. *West Virginia*,
597 U. S., at ——. Congress is not unaware of the challen-
ges facing student borrowers. "More than 80 student loan
forgiveness bills and other student loan legislation" were
considered by Congress during its 116th session alone.
M. Kantrowitz, Year in Review: Student Loan Forgiveness
Legislation, Forbes, Dec. 24, 2020.[8] And the discussion is
not confined to the halls of Congress. Student loan cancella-
tion "raises questions that are personal and emotionally
charged, hitting fundamental issues about the structure of
the economy." J. Stein, Biden Student Debt Plan Fuels
Broader Debate Over Forgiving Borrowers, Washington
Post, Aug. 31, 2022.

The sharp debates generated by the Secretary's extraordi-
nary program stand in stark contrast to the unanimity with
which Congress passed the HEROES Act. The dissent asks
us to "[i]magine asking the enacting Congress: Can the Sec-
retary use his powers to give borrowers more relief when

---

[8] Resolutions were also introduced in 2020 and 2021 "[c]alling on the
President . . . to take executive action to broadly cancel Federal student
loan debt." See S. Res. 711, 116th Cong., 2d Sess. (2020); S. Res. 46, 117th
Cong., 1st Sess. (2021). Those resolutions failed to reach a vote.

an emergency has inflicted greater harm?" *Post*, at 547. The dissent "can't believe" the answer would be no. *Ibid.* But imagine instead asking the enacting Congress a more pertinent question: "Can the Secretary use his powers to abolish $430 billion in student loans, completely canceling loan balances for 20 million borrowers, as a pandemic winds down to its end?" We can't believe the answer would be yes. Congress did not unanimously pass the HEROES Act with such power in mind. "A decision of such magnitude and consequence" on a matter of "'earnest and profound debate across the country'" must "res[t] with Congress itself, or an agency acting pursuant to a clear delegation from that representative body." *West Virginia*, 597 U. S., at —, — (quoting *Gonzales* v. *Oregon*, 546 U. S. 243, 267–268 (2006)). As then-Speaker of the House Nancy Pelosi explained:

> "People think that the President of the United States has the power for debt forgiveness. He does not. He can postpone. He can delay. But he does not have that power. That has to be an act of Congress." Press Conference, Office of the Speaker of the House (July 28, 2021).

Aside from reiterating its interpretation of the statute, the dissent offers little to rebut our conclusion that "indicators from our previous major questions cases are present" here. *Post*, at 521 (BARRETT, J., concurring). The dissent insists that "[s]tudent loans are in the Secretary's wheelhouse." *Post*, at 545 (opinion of KAGAN, J.). But in light of the sweeping and unprecedented impact of the Secretary's loan forgiveness program, it would seem more accurate to describe the program as being in the "wheelhouse" of the House and Senate Committees on Appropriations. Rather than dispute the extent of that impact, the dissent chooses to mount a frontal assault on what it styles "the Court's made-up major questions doctrine." *Post*, at 549. But its attempt to relitigate *West Virginia* is misplaced. As we explained in that case, while the major questions "label" may be relatively recent, it refers to "an identifiable body of law that has

developed over a series of significant cases" spanning decades. *West Virginia*, 597 U. S., at ——. At any rate, "the issue now is not whether [*West Virginia* is] correct. The question is whether that case is distinguishable from this one. And it is not." *Collins* v. *Yellen*, 594 U. S. ——, —— (2021) (KAGAN, J., concurring in part and concurring in judgment).

The Secretary, for his part, acknowledges that *West Virginia* is the law. Brief for United States 47–48. But he objects that its principles apply only in cases concerning "agency action[s] involv[ing] the power to regulate, not the provision of government benefits." Reply Brief 21. In the Government's view, "there are fewer reasons to be concerned" in cases involving benefits, which do not impose "profound burdens" on individual rights or cause "regulatory effects that might prompt a note of caution in other contexts involving exercises of emergency powers." Tr. of Oral Arg. 61.

This Court has never drawn the line the Secretary suggests—and for good reason. Among Congress's most important authorities is its control of the purse. U. S. Const., Art. I, § 9, cl. 7; see also *Office of Personnel Management* v. *Richmond*, 496 U. S. 414, 427 (1990) (the Appropriations Clause is "a most useful and salutary check upon profusion and extravagance" (internal quotation marks omitted)). It would be odd to think that separation of powers concerns evaporate simply because the Government is providing monetary benefits rather than imposing obligations. As we observed in *West Virginia*, experience shows that major questions cases "have arisen from all corners of the administrative state," and administrative action resulting in the conferral of benefits is no exception to that rule. 597 U. S., at ——. In *King* v. *Burwell*, 576 U. S. 473 (2015), we declined to defer to the Internal Revenue Service's interpretation of a healthcare statute, explaining that the provision at issue affected "billions of dollars in spending each year and . . . the price of health insurance for millions of people." *Id.*, at 485. Be-

cause the interpretation of the provision was "a question of deep 'economic and political significance' that is central to [the] statutory scheme," we said, we would not assume that Congress entrusted that task to an agency without a clear statement to that effect. *Ibid.* (quoting *Utility Air*, 573 U. S., at 324). That the statute at issue involved government benefits made no difference in *King*, and it makes no difference here.

All this leads us to conclude that "[t]he basic and consequential tradeoffs" inherent in a mass debt cancellation program "are ones that Congress would likely have intended for itself." *West Virginia*, 597 U. S., at ——. In such circumstances, we have required the Secretary to "point to 'clear congressional authorization'" to justify the challenged program. *Id.*, at ——, —— (quoting *Utility Air*, 573 U. S., at 324). And as we have already shown, the HEROES Act provides no authorization for the Secretary's plan even when examined using the ordinary tools of statutory interpretation—let alone "clear congressional authorization" for such a program.[9]

*        *        *

It has become a disturbing feature of some recent opinions to criticize the decisions with which they disagree as going beyond the proper role of the judiciary. Today, we have concluded that an instrumentality created by Missouri, governed by Missouri, and answerable to Missouri is indeed part of Missouri; that the words "waive or modify" do not mean

---

[9] The dissent complains that our application of the major questions doctrine is a "tell" revealing that "'normal' statutory interpretation cannot sustain [our] decision." *Post*, at 542, 549. Not so. As we have explained, the statutory text alone precludes the Secretary's program. Today's opinion simply reflects this Court's familiar practice of providing multiple grounds to support its conclusions. See, *e. g.*, *Kucana* v. *Holder*, 558 U. S. 233, 243–252 (2010) (interpreting the text of a federal immigration statute in the first instance, then citing the "presumption favoring judicial review of administrative action" as an additional sufficient basis for the Court's decision). The fact that multiple grounds support a result is usually regarded as a strength, not a weakness.

"completely rewrite"; and that our precedent—old and new—requires that Congress speak clearly before a Department Secretary can unilaterally alter large sections of the American economy. We have employed the traditional tools of judicial decisionmaking in doing so. Reasonable minds may disagree with our analysis—in fact, at least three do. See *post*, p. 521 (KAGAN, J., dissenting). We do not mistake this plainly heartfelt disagreement for disparagement. It is important that the public not be misled either. Any such misperception would be harmful to this institution and our country.

The judgment of the District Court for the Eastern District of Missouri is reversed, and the case is remanded for further proceedings consistent with this opinion. The Government's application to vacate the Eighth Circuit's injunction is denied as moot.

*It is so ordered.*

JUSTICE BARRETT, concurring.

I join the Court's opinion in full. I write separately to address the States' argument that, under the "major questions doctrine," we can uphold the Secretary of Education's loan cancellation program only if he points to " 'clear congressional authorization' " for it. *West Virginia* v. *EPA*, 597 U. S. ——, —— (2022). In this case, the Court applies the ordinary tools of statutory interpretation to conclude that the HEROES Act does not authorize the Secretary's plan. *Ante*, at 494–500. The major questions doctrine reinforces that conclusion but is not necessary to it. *Ante*, at 506.

Still, the parties have devoted significant attention to the major questions doctrine, and there is an ongoing debate about its source and status. I take seriously the charge that the doctrine is inconsistent with textualism. *West Virginia*, 597 U. S., at —— (KAGAN, J., dissenting) ("When [textualism] would frustrate broader goals, special canons like the 'major questions doctrine' magically appear as get-out-of-text-free cards"). And I grant that some articulations of the major

questions doctrine on offer—most notably, that the doctrine is a substantive canon—should give a textualist pause.

Yet for the reasons that follow, I do not see the major questions doctrine that way. Rather, I understand it to emphasize the importance of *context* when a court interprets a delegation to an administrative agency. Seen in this light, the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation.

## I

## A

Substantive canons are rules of construction that advance values external to a statute.[1] A. Barrett, Substantive Canons and Faithful Agency, 90 B. U. L. Rev. 109, 117 (2010) (Barrett). Some substantive canons, like the rule of lenity, play the modest role of breaking a tie between equally plausible interpretations of a statute. *United States* v. *Santos*, 553 U. S. 507, 514 (2008) (plurality opinion). Others are more aggressive—think of them as strong-form substantive canons. Unlike a tie-breaking rule, a strong-form canon counsels a court to *strain* statutory text to advance a particular value. Barrett 168. There are many such canons on the books, including constitutional avoidance, the clear-statement federalism rules, and the presumption against retroactivity. *Id.*, at 138–145, 172–173. Such rules effectively impose a "clarity tax" on Congress by demanding that it speak unequivocally if it wants to accomplish certain ends. J. Manning, Clear Statement Rules and the Constitution, 110 Colum. L. Rev. 399, 403 (2010). This "clear statement" requirement means that the better interpretation of a statute will not necessarily prevail. *E. g.*, *Boechler* v. *Commis-*

---

[1] They stand in contrast to linguistic or descriptive canons, which are designed to reflect grammatical rules (such as the punctuation canon) or speech patterns (like the inclusion of some things implies the exclusion of others). A. Barrett, Substantive Canons and Faithful Agency, 90 B. U. L. Rev. 109, 117 (2010).

BARRETT, J., concurring

*sioner*, 596 U. S. ——, —— (2022) ("[I]n this context, better is not enough"). Instead, if the better reading leads to a disfavored result (like provoking a serious constitutional question), the court will adopt an inferior-but-tenable reading to avoid it. So to achieve an end protected by a strong-form canon, Congress must close all plausible off ramps.

While many strong-form canons have a long historical pedigree, they are "in significant tension with textualism" insofar as they instruct a court to adopt something other than the statute's most natural meaning. Barrett 123–124. The usual textualist enterprise involves "hear[ing] the words as they would sound in the mind of a skilled, objectively reasonable user of words." F. Easterbrook, The Role of Original Intent in Statutory Construction, 11 Harv. J. L. & Pub. Pol'y 59, 65 (1988). But a strong-form canon "load[s] the dice for or against a particular result" in order to serve a value that the judiciary has chosen to specially protect. A. Scalia, A Matter of Interpretation 27 (1997) (Scalia); see also Barrett 124, 168–169. Even if the judiciary's adoption of such canons can be reconciled with the Constitution,[2] it is undeniable that they pose "a lot of trouble" for "the honest textualist." Scalia 28.

―――――――

[2] Whether the creation or application of strong-form canons exceeds the "judicial Power" conferred by Article III is a difficult question. On the one hand, "federal courts have been developing and applying [such] canons for as long as they have been interpreting statutes," and that is some reason to regard the practice as consistent with the original understanding of the "judicial Power." *Id.*, at 155, 176. Moreover, many strong-form canons advance constitutional values, which heightens their claim to legitimacy. *Id.*, at 168–170. On the other hand, these canons advance constitutional values by imposing prophylactic constraints on Congress—and that is in tension with the Constitution's structure. *Id.*, at 174, 176. Thus, even assuming that the federal courts have not overstepped by adopting such canons in the past, I am wary of adopting new ones—and if the major questions doctrine were a newly minted strong-form canon, I would not embrace it. In my view, however, the major questions doctrine is neither new nor a strong-form canon.

## B

Some have characterized the major questions doctrine as a strong-form substantive canon designed to enforce Article I's Vesting Clause. See, *e. g.*, C. Sunstein, There Are Two "Major Questions" Doctrines, 73 Admin. L. Rev. 475, 483–484 (2021) (asserting that recent cases apply the major questions doctrine as "a nondelegation canon"); L. Heinzerling, The Power Canons, 58 Wm. & Mary L. Rev. 1933, 1946–1948 (2017) (describing the major questions doctrine as a "normative" canon that "is both a presumption against certain kinds of agency interpretations and an instruction to Congress"). On this view, the Court overprotects the nondelegation principle by increasing the cost of delegating authority to agencies—namely, by requiring Congress to speak unequivocally in order to grant them significant rule-making power. See Barrett 172–176; see also *post*, at 547 (KAGAN, J., dissenting) (describing the major questions doctrine as a "heightened-specificity requirement"); *Georgia* v. *President of the United States*, 46 F. 4th 1283, 1314 (CA11 2022) (Anderson, J., concurring in part and dissenting in part) ("[T]he major questions doctrine is essentially a clear-statement rule"). This "clarity tax" might prevent Congress from getting too close to the nondelegation line, especially since the "intelligible principle" test largely leaves Congress to self-police. (So the doctrine would function like constitutional avoidance.) In addition or instead, the doctrine might reflect the judgment that it is so important for Congress to exercise "[a]ll legislative Powers," Art. I, § 1, that it should be forced to think twice before delegating substantial discretion to agencies—even if the delegation is well within Congress's power to make. (So the doctrine would function like the rule that Congress must speak clearly to abrogate state sovereign immunity.) No matter which rationale justifies it, this "clear statement" version of the major questions doctrine "loads the dice" so that a plausible antidelegation interpretation wins even if the agency's interpretation is better.

BARRETT, J., concurring

While one could walk away from our major questions cases with this impression, I do not read them this way. No doubt, many of our cases express an expectation of "clear congressional authorization" to support sweeping agency action. See, *e. g.*, *West Virginia*, 597 U. S., at ——; *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014); see also *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ——, —— (2021) (*per curiam*). But none requires "an 'unequivocal declaration'" from Congress authorizing the *precise* agency action under review, as our clear-statement cases do in their respective domains. See *Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. 339, 347 (2023). And none purports to depart from the best interpretation of the text—the hallmark of a true clear-statement rule.

So what work is the major questions doctrine doing in these cases? I will give you the long answer, but here is the short one: The doctrine serves as an interpretive tool reflecting "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000).

## II

The major questions doctrine situates text in context, which is how textualists, like all interpreters, approach the task at hand. C. Nelson, What Is Textualism? 91 Va. L. Rev. 347, 348 (2005) ("[N]o 'textualist' favors isolating statutory language from its surrounding context"); Scalia 37 ("In textual interpretation, context is everything"). After all, the meaning of a word depends on the circumstances in which it is used. J. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387, 2457 (2003) (Manning). To strip a word from its context is to strip that word of its meaning.

Context is not found exclusively "'within the four corners' of a statute." *Id.*, at 2456. Background legal conventions,

for instance, are part of the statute's context. F. Easterbrook, The Case of the Speluncean Explorers: Revisited, 112 Harv. L. Rev. 1876, 1913 (1999) ("Language takes meaning from its linguistic context," as well as "historical and governmental contexts"). Thus, courts apply a presumption of *mens rea* to criminal statutes, *Xiulu Ruan* v. *United States*, 597 U. S. ——, —— (2022), and a presumption of equitable tolling to statutes of limitations, *Irwin* v. *Department of Veterans Affairs*, 498 U. S. 89, 95–96 (1990). It is also well established that "[w]here Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George* v. *McDonough*, 596 U. S. ——, —— (2022) (internal quotation marks omitted). I could go on. See, *e. g.*, *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. 118, 132 (2014) (federal causes of action are construed "to incorporate a requirement of proximate causation"); *Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co.*, 505 U. S. 214, 231 (1992) ("*de minimis non curat lex*"). As it happens, "[t]he notion that some things 'go without saying' applies to legislation just as it does to everyday life." *Bond* v. *United States*, 572 U. S. 844, 857 (2014).

Context also includes common sense, which is another thing that "goes without saying." Case reporters and casebooks brim with illustrations of why literalism—the antithesis of context-driven interpretation—falls short. Consider the classic example of a statute imposing criminal penalties on "'whoever drew blood in the streets.'" *United States* v. *Kirby*, 7 Wall. 482, 487 (1869). Read literally, the statute would cover a surgeon accessing a vein of a person in the street. But "common sense" counsels otherwise, *ibid.*, because in the context of the criminal code, a reasonable observer would "expect the term 'drew blood' to describe a violent act," Manning 2461. Common sense similarly bears on judgments like whether a floating home is a "vessel," *Lozman* v. *Riviera Beach*, 568 U. S. 115, 120–121 (2013), whether tomatoes are "vegetables," *Nix* v. *Hedden*, 149 U. S. 304,

306–307 (1893), and whether a skin irritant is a "chemical weapon," *Bond*, 572 U. S., at 860–862.

Why is any of this relevant to the major questions doctrine? Because context is also relevant to interpreting the scope of a delegation. Think about agency law, which is all about delegations. When an agent acts on behalf of a principal, she "has actual authority to take action designated or implied in the principal's manifestations to the agent . . . as the agent reasonably understands [those] manifestations." Restatement (Third) of Agency § 2.02(1) (2005). Whether an agent's understanding is reasonable depends on "[t]he *context* in which principal and agent interact," including their "[p]rior dealings," industry "customs and usages," and "the nature of the principal's business or the principal's personal situation." *Id.*, § 2.02, Comment *e* (emphasis added). With that in mind, imagine that a grocer instructs a clerk to "go to the orchard and buy apples for the store." Though this grant of apple-purchasing authority sounds unqualified, a reasonable clerk would know that there are limits. For example, if the grocer usually keeps 200 apples on hand, the clerk does not have actual authority to buy 1,000—the grocer would have spoken more directly if she meant to authorize such an out-of-the-ordinary purchase. A clerk who disregards context and stretches the words to their fullest will not have a job for long.

This is consistent with how we communicate conversationally. Consider a parent who hires a babysitter to watch her young children over the weekend. As she walks out the door, the parent hands the babysitter her credit card and says: "Make sure the kids have fun." Emboldened, the babysitter takes the kids on a road trip to an amusement park, where they spend two days on rollercoasters and one night in a hotel. Was the babysitter's trip consistent with the parent's instruction? Maybe in a literal sense, because the instruction was open-ended. But was the trip consistent with a *reasonable* understanding of the parent's instruction? Highly doubtful. In the normal course, permission to spend

money on fun authorizes a babysitter to take children to the local ice cream parlor or movie theater, not on a multiday excursion to an out-of-town amusement park. If a parent were willing to greenlight a trip that big, we would expect much more clarity than a general instruction to "make sure the kids have fun."

But what if there is more to the story? Perhaps there is obvious contextual evidence that the babysitter's jaunt was permissible—for example, maybe the parent left tickets to the amusement park on the counter. Other clues, though less obvious, can also demonstrate that the babysitter took a reasonable view of the parent's instruction. Perhaps the parent showed the babysitter where the suitcases are, in the event that she took the children somewhere overnight. Or maybe the parent mentioned that she had budgeted $2,000 for weekend entertainment. Indeed, some relevant points of context may not have been communicated by the parent at all. For instance, we might view the parent's statement differently if this babysitter had taken the children on such trips before or if the babysitter were a grandparent.

In my view, the major questions doctrine grows out of these same commonsense principles of communication. Just as we would expect a parent to give more than a general instruction if she intended to authorize a babysitter-led getaway, we also "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air*, 573 U. S., at 324. That clarity may come from specific words in the statute, but context can also do the trick. Surrounding circumstances, whether contained within the statutory scheme or external to it, can narrow or broaden the scope of a delegation to an agency.

This expectation of clarity is rooted in the basic premise that Congress normally "intends to make major policy decisions itself, not leave those decisions to agencies." *United States Telecom Assn.* v. *FCC*, 855 F. 3d 381, 419 (CADC 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc). Or,

as Justice Breyer once observed, "Congress is more likely to have focused upon, and answered, major questions, while leaving interstitial matters [for agencies] to answer themselves in the course of the statute's daily administration." S. Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 370 (1986); see also A. Gluck & L. Bressman, Statutory Interpretation From the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 1003–1006 (2013). That makes eminent sense in light of our constitutional structure, which is itself part of the legal context framing any delegation. Because the Constitution vests Congress with "[a]ll legislative Powers," Art. I, §1, a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch. See *West Virginia*, 597 U. S., at —— (explaining that the major questions doctrine rests on "both separation of powers principles and a practical understanding of legislative intent").

Crucially, treating the Constitution's structure as part of the context in which a delegation occurs is *not* the same as using a clear-statement rule to overenforce Article I's non-delegation principle (which, again, is the rationale behind the substantive-canon view of the major questions doctrine). My point is simply that in a system of separated powers, a reasonably informed interpreter would expect Congress to legislate on "important subjects" while delegating away only "the details." *Wayman* v. *Southard*, 10 Wheat. 1, 43 (1825). That is different from a normative rule that *discourages* Congress from empowering agencies. To see what I mean, return to the ambitious babysitter. Our expectation of clearer authorization for the amusement-park trip is not about discouraging the parent from giving significant leeway to the babysitter or forcing the parent to think hard before doing so. Instead, it reflects the intuition that the parent is in charge and sets the terms for the babysitter—so if a judgment is significant, we expect the parent to make it. If, by

contrast, one parent left the children with the other parent for the weekend, we would view the same trip differently because the parents share authority over the children. In short, the balance of power between those in a relationship inevitably frames our understanding of their communications. And when it comes to the Nation's policy, the Constitution gives Congress the reins—a point of context that no reasonable interpreter could ignore.

Given these baseline assumptions, an interpreter should "typically greet" an agency's claim to "extravagant statutory power" with at least some "measure of skepticism." *Utility Air*, 573 U. S., at 324. That skepticism is neither "made-up" nor "new." *Post*, at 543, 549 (KAGAN, J., dissenting). On the contrary, it appears in a line of decisions spanning at least 40 years. *E. g.*, *King* v. *Burwell*, 576 U. S. 473, 485–486 (2015); *Gonzales* v. *Oregon*, 546 U. S. 243, 267–268 (2006); *Brown & Williamson*, 529 U. S., at 159–160; *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 645 (1980) (plurality opinion).[3]

Still, this skepticism does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority—and that marks a key difference between my view and the "clear statement" view of the major questions doctrine. In some cases, the court's initial skepticism might be overcome by text directly authorizing the agency action or context demonstrating that the agency's interpretation is convincing. (And because context can suffice, I disagree with JUSTICE KAGAN's critique that "[t]he doctrine forces Congress to delegate in highly specific terms." *Post*, at 544.) If so, the court must adopt the agency's reading despite the "major-

---

[3] Indeed, the doctrine may have even deeper roots. See *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479, 494–495 (1897) (explaining that for agency assertions of "vast and comprehensive" power, "no just rule of construction would tolerate a grant of such power by mere implication").

ness" of the question.[4]   In other cases, however, the court might conclude that the agency's expansive reading, even if "plausible," is not the best.   *West Virginia*, 597 U. S., at ——. In that event, the major questions doctrine plays a role, because it helps explain the court's conclusion that the agency overreached.

Consider *Brown & Williamson*, in which we rejected the Food and Drug Administration's (FDA's) determination that tobacco products were within its regulatory purview.   529 U. S., at 131.   The agency's assertion of authority—which depended on the argument that nicotine is a " 'drug' " and that cigarettes and smokeless tobacco are " 'drug delivery devices' "—would have been plausible if the relevant statutory text were read in a vacuum.   *Ibid.*   But a vacuum is no home for a textualist.   Instead, we stressed that the "meaning" of a word or phrase "may only become evident when placed in *context.*"   *Id.*, at 132 (emphasis added). And the critical context in *Brown & Williamson* was tobacco's "unique political history": the FDA's longstanding disavowal of authority to regulate it, Congress's creation of "a distinct regulatory scheme for tobacco products," and the tobacco industry's "significant" role in "the American economy."   *Id.*, at 159–160.   In light of those considerations, we concluded that "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."   *Id.*, at 160.

We have also been "[s]keptical of mismatches" between broad "invocations of power by agencies" and relatively narrow "statutes that purport to delegate that power."   *In re MCP No. 165, OSHA, Interim Final Rule: Covid–19 Vaccination and Testing*, 20 F. 4th 264, 272 (CA6 2021) (Sutton,

--------

[4] I am dealing only with statutory interpretation, not the separate argument that a statutory delegation exceeds constitutional limits.   See *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 474 (2001) (describing a delegation held unconstitutional because it "conferred authority to regulate the entire economy on the basis of" an imprecise standard).

C. J., dissenting from denial of initial hearing en banc). Just as an instruction to "pick up dessert" is not permission to buy a four-tier wedding cake, Congress's use of a "subtle device" is not authorization for agency action of "enormous importance." *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 231 (1994); cf. *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes"). This principle explains why the Centers for Disease Control and Prevention's (CDC's) general authority to "'prevent the . . . spread of communicable diseases'" did not authorize a nationwide eviction moratorium. *Alabama Assn. of Realtors*, 594 U. S., at —— – ——, ——. The statute, we observed, was a "wafer-thin reed" that could not support the assertion of "such sweeping power." *Id.*, at ——. Likewise, in *West Virginia*, we held that a "little-used backwater" provision in the Clean Air Act could not justify an Environmental Protection Agency (EPA) rule that would "restructur[e] the Nation's overall mix of electricity generation." 597 U. S., at ——, ——.

Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse. For instance, in *Gonzales* v. *Oregon*, we rebuffed an interpretive rule from the Attorney General that restricted the use of controlled substances in physician-assisted suicide. 546 U. S., at 254, 275. This judgment, we explained, was a medical one that lay beyond the Attorney General's expertise, and so a sturdier source of statutory authority than "an implicit delegation" was required. *Id.*, at 267–268. Likewise, in *King* v. *Burwell*, we blocked the Internal Revenue Service's (IRS's) attempt to decide whether the Affordable Care Act's tax credits could be available on federally established exchanges. 576 U. S., at 485–486. Among other things, the IRS's lack of "expertise in crafting health insurance policy" made us think that "had Congress wished to assign that question to an agency, it surely would have done so expressly." *Id.*, at 486. Echoing the theme,

our reasoning in *Alabama Association of Realtors* rested partly on the fact that the CDC's eviction moratorium "intrude[d] into . . . the landlord-tenant relationship"—hardly the day-in, day-out work of a public-health agency. 594 U. S., at ——. *National Federation of Independent Business* v. *OSHA* is of a piece. 595 U. S. 109 (2022) (*per curiam*). There, we held that the Occupational Safety and Health Administration's (OSHA's) authority to ensure "'safe and healthful working conditions'" did not encompass the power to mandate the vaccination of employees; as we explained, the statute empowered the agency "to set *workplace* safety standards, not broad public health measures." *Id.*, at 114, 117. The shared intuition behind these cases is that a reasonable speaker would not understand Congress to confer an unusual form of authority without saying more.

We have also pumped the brakes when "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'" *Utility Air*, 573 U. S., at 324. Of course, an agency's post-enactment conduct does not control the meaning of a statute, but "this Court has long said that courts may consider the consistency of an agency's views when we weigh the persuasiveness of any interpretation it proffers in court." *Bittner* v. *United States*, 598 U. S. 85, 97 (2023) (citing *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)). The agency's track record can be particularly probative in this context: A long-standing "want of assertion of power by those who presumably would be alert to exercise it" may provide some clue that the power was never conferred. *FTC* v. *Bunte Brothers, Inc.*, 312 U. S. 349, 352 (1941). Once again, *Brown & Williamson* is a good example. There, we balked at the FDA's novel attempt to regulate tobacco in part because this move was "[c]ontrary to its representations to Congress since 1914." 529 U. S., at 159. And in *Utility Air*, we were dubious when the EPA discovered "newfound authority" in the Clean Air Act that would have allowed it to require greenhouse-gas permits for "millions of small sources—in-

cluding retail stores, offices, apartment buildings, shopping centers, schools, and churches." 573 U. S., at 328.

If the major questions doctrine were a substantive canon, then the common thread in these cases would be that we "exchange[d] the most natural reading of a statute for a bearable one more protective of a judicially specified value." Barrett 111. But by my lights, the Court arrived at the most plausible reading of the statute in these cases. To be sure, "[a]ll of these regulatory assertions had a colorable textual basis." *West Virginia*, 597 U. S., at ——. In each case, we could have "[p]ut on blinders" and confined ourselves to the four corners of the statute, and we might have reached a different outcome. *Sykes* v. *United States*, 564 U. S. 1, 43 (2011) (KAGAN, J., dissenting). Instead, we took "off those blinders," "view[ed] the statute as a whole," *ibid.*, and considered context that would be important to a reasonable observer. With the full picture in view, it became evident in each case that the agency's assertion of "highly consequential power" went "beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U. S., at ——.

## III

As for today's case: The Court surely could have "hi[t] the send button," *post*, at 542 (KAGAN, J., dissenting), after the routine statutory analysis set out in Part III–A. But it is nothing new for a court to punctuate its conclusion with an additional point, and the major questions doctrine is a good one here. *Ante*, at 506, n. 9. It is obviously true that the Secretary's loan cancellation program has "vast 'economic and political significance.'" *Utility Air*, 573 U. S., at 324. That matters not because agencies are incapable of making highly consequential decisions, but rather because an initiative of this scope, cost, and political salience is not the type that Congress lightly delegates to an agency. And for the reasons given by the Court, the HEROES Act provides no indication that Congress empowered the Secretary to do anything of the sort. *Ante*, at 494–500, 506.

Granted, some context clues from past major questions cases are absent here—for example, this is not a case where the agency is operating entirely outside its usual domain. But the doctrine is not an on-off switch that flips when a critical mass of factors is present—again, it simply reflects "common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude." *Brown & Williamson*, 529 U. S., at 133. Common sense tells us that as more indicators from our previous major questions cases are present, the less likely it is that Congress would have delegated the power to the agency without saying so more clearly.

Here, enough of those indicators are present to demonstrate that the Secretary has gone far "beyond what Congress could reasonably be understood to have granted" in the HEROES Act. *West Virginia*, 597 U. S., at ——. Our decision today does not "trump" the statutory text, nor does it make this Court the "arbiter" of "national policy." *Post*, at 543, 545 (Kagan, J., dissenting). Instead, it gives Congress's words their best reading.

\*     \*     \*

The major questions doctrine has an important role to play when courts review agency action of "vast 'economic and political significance.'" *Utility Air*, 573 U. S., at 324. But the doctrine should not be taken for more than it is—the familiar principle that we do not interpret a statute for all it is worth when a reasonable person would not read it that way.

Justice Kagan, with whom Justice Sotomayor and Justice Jackson join, dissenting.

In every respect, the Court today exceeds its proper, limited role in our Nation's governance.

Some 20 years ago, Congress enacted legislation, called the HEROES Act, authorizing the Secretary of Education to provide relief to student-loan borrowers when a national emergency struck. The Secretary's authority was bounded:

He could do only what was "necessary" to alleviate the emergency's impact on affected borrowers' ability to repay their student loans. 20 U. S. C. §1098bb(a)(2). But within that bounded area, Congress gave discretion to the Secretary. He could "waive or modify any statutory or regulatory provision" applying to federal student-loan programs, including provisions relating to loan repayment and forgiveness. And in so doing, he could replace the old provisions with new "terms and conditions." §§1098bb(a)(1), (b)(2). The Secretary, that is, could give the relief that was needed, in the form he deemed most appropriate, to counteract the effects of a national emergency on borrowers' capacity to repay. That may have been a good idea, or it may have been a bad idea. Either way, it was what Congress said.

When COVID hit, two Secretaries serving two different Presidents decided to use their HEROES Act authority. The first suspended loan repayments and interest accrual for all federally held student loans. The second continued that policy for a time, and then replaced it with the loan forgiveness plan at issue here, granting most low- and middle-income borrowers up to $10,000 in debt relief. Both relied on the HEROES Act language cited above. In establishing the loan forgiveness plan, the current Secretary scratched the pre-existing conditions for loan discharge, and specified different conditions, opening loan forgiveness to more borrowers. So he "waive[d]" and "modif[ied]" statutory and regulatory provisions and applied other "terms and conditions" in their stead. That may have been a good idea, or it may have been a bad idea. Either way, the Secretary did only what Congress had told him he could.

The Court's first overreach in this case is deciding it at all. Under Article III of the Constitution, a plaintiff must have standing to challenge a government action. And that requires a personal stake—an injury in fact. We do not allow plaintiffs to bring suit just because they oppose a policy. Neither do we allow plaintiffs to rely on injuries suffered by

others. Those rules may sound technical, but they enforce "fundamental limits on federal judicial power." *Allen* v. *Wright*, 468 U. S. 737, 750 (1984). They keep courts acting like courts. Or stated the other way around, they prevent courts from acting like this Court does today. The plaintiffs in this case are six States that have no personal stake in the Secretary's loan forgiveness plan. They are classic ideological plaintiffs: They think the plan a very bad idea, but they are no worse off because the Secretary differs. In giving those States a forum—in adjudicating their complaint—the Court forgets its proper role. The Court acts as though it is an arbiter of political and policy disputes, rather than of cases and controversies.

And the Court's role confusion persists when it takes up the merits. For years, this Court has insisted that the way to keep judges' policy views and preferences out of judicial decisionmaking is to hew to a statute's text. The HEROES Act's text settles the legality of the Secretary's loan forgiveness plan. The statute provides the Secretary with broad authority to give emergency relief to student-loan borrowers, including by altering usual discharge rules. What the Secretary did fits comfortably within that delegation. But the Court forbids him to proceed. As in other recent cases, the rules of the game change when Congress enacts broad delegations allowing agencies to take substantial regulatory measures. See, *e. g.*, *West Virginia* v. *EPA*, 597 U. S. ―― (2022). Then, as in this case, the Court reads statutes unnaturally, seeking to cabin their evident scope. And the Court applies heightened-specificity requirements, thwarting Congress's efforts to ensure adequate responses to unforeseen events. The result here is that the Court substitutes itself for Congress and the Executive Branch in making national policy about student-loan forgiveness. Congress authorized the forgiveness plan (among many other actions); the Secretary put it in place; and the President would have been accountable for its success or failure. But this Court

today decides that some 40 million Americans will not re-
ceive the benefits the plan provides, because (so says the
Court) that assistance is too "significan[t]."    *Ante*, at 501–502.
With all respect, I dissent.

I

"No principle is more fundamental to the judiciary's proper
role in our system of government than the constitutional lim-
itation of federal-court jurisdiction to actual cases or contro-
versies."   *Simon* v. *Eastern Ky. Welfare Rights Organiza-
tion*, 426 U. S. 26, 37 (1976).   In our system, "[f]ederal courts
do not possess a roving commission to publicly opine on
every legal question."   *TransUnion LLC* v. *Ramirez*, 594
U. S. ——, —— (2021).   Nor do they "exercise general legal
oversight of the Legislative and Executive Branches."   *Ibid.*
A court may address the legality of a government action only
if the person challenging it has standing—which requires
that the person have suffered a "concrete and particularized
injury."   *Ibid.*   It is not enough for the plaintiff to assert a
"generalized grievance[ ]" about government policy.   *Gill* v.
*Whitford*, 585 U. S. ——, —— (2018).   And critically here, the
plaintiff cannot rest its claim on a third party's rights and
interests.   See *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975).
The plaintiff needs its own stake—a "personal stake"—in the
outcome of the litigation.   *TransUnion*, 594 U. S., at ——.   If
the plaintiff has no such stake, a court must stop in its tracks.
To decide the case is to exceed the permissible boundaries of
the judicial role.

That is what the Court does today.   The plaintiffs here
are six States: Arkansas, Iowa, Kansas, Missouri, Nebraska,
and South Carolina.   They oppose the Secretary's loan can-
cellation plan on varied policy and legal grounds.   But as
everyone agrees, those objections are just general griev-
ances; they do not show the particularized injury needed to
bring suit.   And the States have no straightforward way of
making that showing—of explaining how *they* are harmed by
a plan that reduces individual borrowers' federal student-

loan debt. So the States have thrown no fewer than four different theories of injury against the wall, hoping that a court anxious to get to the merits will say that one of them sticks. The most that can be said of the theory the majority selects, proffered solely by Missouri, is that it is less risible than the others. It still contravenes a bedrock principle of standing law—that a plaintiff cannot ride on someone else's injury. Missouri is doing just that in relying on injuries to the Missouri Higher Education Loan Authority (MOHELA), a legally and financially independent public corporation. And that means the Court, by deciding this case, exercises authority it does not have. It violates the Constitution.

A

Missouri's theory of standing, as accepted by the majority, goes as follows. MOHELA is a state-created corporation participating in the student-loan market. As part of that activity, it has contracted with the Department of Education to service federally held loans—essentially, to handle billing and collect payments for the Federal Government. Under that contract, MOHELA receives an administrative fee for each loan serviced. When a loan is canceled, MOHELA will not get a fee; so the Secretary's plan will cost MOHELA money. And if MOHELA is harmed, Missouri must be harmed, because the corporation is a "public instrumentality" and, as such, "part of Missouri's government." Brief for Respondents 16–17; see *ante*, at 489–491.

Up to the last step, the theory is unexceptionable—except that it points to MOHELA as the proper plaintiff. Financial harm is a classic injury in fact. MOHELA plausibly alleges that it will suffer that harm as a result of the Secretary's plan. So MOHELA can sue the Secretary, as the Government readily concedes. See Tr. of Oral Arg. 18. But not even Missouri, and not even the majority, claims that MOHELA's revenue loss gets passed through to the State. As further discussed below, MOHELA is financially inde-

pendent from Missouri—as corporations typically are, the better to insulate their creators from financial loss. See *infra*, at 527. So MOHELA's revenue decline—the injury in fact claimed to justify this suit—is not in fact Missouri's. The State's treasury will not be out one penny because of the Secretary's plan. The revenue loss allegedly grounding this case is MOHELA's alone.

Which leads to an obvious question: Where's MOHELA? The answer is: As far from this suit as it can manage. MOHELA could have brought this suit. It possesses the power under Missouri law to "sue and be sued" in its own name. Mo. Rev. Stat. § 173.385.1(3) (2016). But MOHELA is not a party here. Nor is it an *amicus.* Nor is it even a rooting bystander. MOHELA was "not involved with the decision of the Missouri Attorney General's Office" to file this suit. Letter from Appellees in No. 22–3179 (CA8), p. 3 (Nov. 1, 2022). And MOHELA did not cooperate with the Attorney General's efforts. When the AG wanted documents relating to MOHELA's loan-servicing contract, to aid him in putting forward the State's standing theory, he had to file formal "sunshine law" demands on the entity. See *id.*, at 3–4. MOHELA had no interest in assisting voluntarily.

If all that makes you suspect that MOHELA is distinct from the State, you would be right. And that is so as a matter of law and financing alike. Yes, MOHELA is a creature of state statute, a public instrumentality established to serve a public function. § 173.360. But the law sets up MOHELA as a corporation—a so-called "body corporate"— with a "[s]eparate legal personality." *Ibid.*; *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 625 (1983) (*Bancec*). Or said a bit differently, MOHELA is—like the lion's share of corporations, whether public or private—a "separate legal [entity] with distinct legal rights and obligations" from those belonging to its creator. *Agency for Int'l Development* v. *Alliance for Open Society Int'l Inc.*, 591 U. S. ——, —— (2020). MOHELA, for example, has the power to contract with other entities, which is how

it entered into a loan-servicing contract with the Department of Education. See §173.385.1(15). MOHELA's assets, including the fees gained from that contract, are not "part of the revenue of the [S]tate" and cannot be "used for the payment of debt incurred by the [S]tate." §§173.386, 173.425. On the other side of the ledger, MOHELA's debts are MOHELA's alone; Missouri cannot be liable for them. §173.410. And as noted earlier, MOHELA has the power to "sue and be sued" independent of Missouri, so it can both "prosecute and defend" all its varied interests. §173.385.1(3); see *supra*, at 526. Indeed, before this case, Missouri had never tried to appear in court on MOHELA's behalf. That is no surprise. In the statutory scheme, independence is everywhere: State law created MOHELA, but in so doing set it apart.

The Missouri Supreme Court itself recognized as much in addressing a near-carbon-copy state instrumentality. MOHEFA (note the one-letter difference) issues bonds to support various health and educational institutions in the State. Like MOHELA, MOHEFA is understood as a "public instrumentality" serving a "public function." *Menorah Medical Center* v. *Health and Ed. Facilities Auth.*, 584 S. W. 2d 73, 76 (Mo. 1979). And like MOHELA, MOHEFA has a board appointed by the Governor and sends annual reports to a state department. See Mo. Rev. Stat. §§360.020, 360.140 (1978); *ante*, at 490 (suggesting those features matter). But the State Supreme Court, when confronted with a claim that MOHEFA's undertakings should be ascribed to the State, could hardly have been more dismissive. The court thought it beyond dispute that MOHEFA "is not the [S]tate," and that its activities are not state activities. *Menorah*, 584 S. W. 2d, at 78. Citing MOHEFA's financial and legal independence, the court explained that "[s]imilar bodies have been adjudged as 'separate entities' from" Missouri. *Ibid.* MOHELA is no different.

Under our usual standing rules, that separation would matter—indeed, would decide this case. A plaintiff, this

Court has held time and again, cannot rest its claim to judicial relief on the "legal rights and interests" of third parties. *Warth*, 422 U. S., at 499. And MOHELA qualifies as such a party, for all the reasons just given. That MOHELA is publicly created makes not a whit of difference: When a "government instrumentalit[y]" is "established as [a] juridical entit[y] distinct and independent from [its] sovereign," the law—including the law of standing—is supposed to treat it that way. *Bancec*, 462 U. S., at 626–627; see *Sloan Shipyards Corp.* v. *United States Shipping Bd. Emergency Fleet Corporation*, 258 U. S. 549, 567 (1922). So this case should have been open-and-shut. Missouri and MOHELA are legally, and also financially, "separate entities." *Menorah*, 584 S. W. 2d, at 78. MOHELA is fully capable of representing its own interests, and always has done so before. The injury to MOHELA thus does not entitle Missouri—under our normal standing rules—to go to court.

And those normal rules are more than just rules: They are, as this case shows, guarantors of our constitutional order. The requirement that the proper party—the party actually affected—challenge an action ensures that courts do not overstep their proper bounds. See *Clapper* v. *Amnesty Int'l USA*, 568 U. S. 398, 408–409 (2013) ("Relaxation of standing [rules] is directly related to the expansion of judicial power"). Without that requirement, courts become "forums for the ventilation of public grievances"—for settlement of ideological and political disputes. *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 473 (1982). The kind of forum this Court has become today. Is there a person in America who thinks Missouri is here because it is worried about MOHELA's loss of loan-servicing fees? I would like to meet him. Missouri is here because it thinks the Secretary's loan cancellation plan makes for terrible, inequitable, wasteful policy. And so too for Arkansas, Iowa, Kansas, Nebraska, and South Carolina. And maybe all of them are right. But that question is not what this Court sits to decide. That

question is "more appropriately addressed in the representative branches," and by the broader public. *Allen*, 468 U. S., at 751. Our third-party standing rules, like the rest of our standing doctrine, exist to separate powers in that way—to send political issues to political institutions, and retain only legal controversies, brought by plaintiffs who have suffered real legal injury. If MOHELA had brought this suit, we would have had to resolve it, however hot or divisive. But Missouri? In adjudicating Missouri's claim, the majority reaches out to decide a matter it has no business deciding. It blows through a constitutional guardrail intended to keep courts acting like courts.

B

The majority does not over-expend itself in defending that action. It recites the State's assertion that a "harm to MOHELA is also a harm to Missouri" because the former is the latter's instrumentality. *Ante*, at 490. But in doing so, the majority barely addresses MOHELA's separate corporate identity, its financial independence, and its distinct legal rights. In other words, the majority glides swiftly over all the attributes of MOHELA ensuring that its economic losses (1) are not passed on to the State and (2) can be rectified (if there is legal wrong) without the State's help. The majority is left to argue from a couple of prior decisions and a single idea, the latter relating to the State's desire to "aid Missouri college students." *Ante*, at 491. But the decisions do not stand for what the majority claims. And the idea collides with another core precept of standing law. All in all, the majority's justifications turn standing law from a pillar of a restrained judiciary into nothing more than "a lawyer's game." *Massachusetts* v. *EPA*, 549 U. S. 497, 548 (2007) (ROBERTS, C. J., dissenting).

The majority mainly relies on *Arkansas* v. *Texas*, 346 U. S. 368 (1953), but that case shows only that not all public instrumentalities are the same. The Court there held that Arkansas could bring suit on behalf of a state university. But it did so because the school *lacked* the financial and legal sepa-

rateness MOHELA has. Arkansas, we observed, "owns all the property used by the University." *Id.*, at 370. And the suit, if successful, would have enhanced that property: The litigation sought to stop Texas from interfering with a contract to build a medical facility on campus. For the same reason, the Court found that "any injury under the contract to the University is an injury to Arkansas": The State was the principal beneficiary of the contract to improve its own property. *Ibid.* So Arkansas had the sort of direct financial interest not present here. And there is more: The University, the Court thought, could not sue on its own. See *ibid.* The majority suggests otherwise, citing a state-court decision holding that corporations usually have the power to bring and defend legal actions. See *ante*, at 493. But the *Arkansas* Court referenced a different state-court decision—one holding that another state school was "not authorized" to "sue and be sued." *Allen Eng. Co.* v. *Kays*, 106 Ark. 174, 177, 152 S. W. 992, 993 (1913); see *Arkansas*, 346 U. S., at 370, and n. 9. That decision led this Court to conclude that Arkansas law treated "a suit against the University" as "a suit against the State." *Id.*, at 370. But if state law had not done so—as it does not in Missouri for MOHELA? See *supra*, at 526–527. The Court made clear that a State cannot stand in for an independent entity. The State, the Court said, "must, of course, represent an interest of her own and not merely that of her citizens or corporations." 346 U. S., at 310.

The majority's second case—*Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374 (1995)—is yet further afield. The issue there was whether Amtrak, a public corporation similar to MOHELA, had to comply with the First Amendment. The Court held that it did, labeling Amtrak a state actor for that purpose. On the opposite view, we reasoned, a government could "evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form." *Id.*, at 397; see *ibid.* (noting that *Plessy* could then be "resurrected by the simple device" of creating

a public corporation to run trains). But that did not mean
Amtrak was equivalent to the Government for all purposes.
Over and over, we cabined our holding that Amtrak was a
state actor by adding a phrase like "for purposes of the First
Amendment" or other constitutional rights. *Id.*, at 400; see
*id.*, at 383 (Amtrak "must be regarded as a Government en-
tity for First Amendment purposes"); *id.*, at 392 (Amtrak is
"a Government entity for purposes of determining the consti-
tutional rights of citizens"); *id.*, at 394 (Amtrak is an "instru-
mentality of the United States for the purpose of individual
rights guaranteed against the Government"); *id.*, at 397, 399,
400 (similar, similar, and similar). But for other purposes, a
different rule might, or would, obtain. Our holding, we said,
did not mean Amtrak had sovereign immunity. See *id.*, at
392. And most relevant here, we reaffirmed that "[t]he
State does not, by becoming a corporator, identify itself with
the corporation" for purposes of litigation. *Id.*, at 398. Or
said again, the Government is "not a party to suits brought
by or against" its corporation. *Id.*, at 399. So what *Lebron*
tells us about MOHELA is that it must comply with the Con-
stitution. *Lebron* offers no support (more like the opposite)
for the different view that MOHELA and Missouri are inter-
changeable parties in litigation.[1]

---

[1] The same goes for the majority's other case about Amtrak, which just
"reiterate[s]" *Lebron*'s reasoning. *Ante*, at 493; see *Department of Trans-
portation* v. *Association of American Railroads*, 575 U. S. 43 (2015).
There too we held that Amtrak was a "governmental entity" for purposes
of the "requirements of the Constitution"—specifically, the nondelegation
doctrine. *Id.*, at 54. And there too we kept our holding as limited as
possible, repeatedly stating that we were treating Amtrak as the Govern-
ment for that purpose alone. See, *e. g.*, *id.*, at 51 ("for purposes of
separation-of-powers analysis under the Constitution"); *id.*, at 54 ("for pur-
poses of the Constitution's separation of powers provisions"); *id.*, at 55
("for purposes of determining the constitutional issues presented in this
case"). As for any other purpose? Not a word to suggest the same re-
sult. And as even the majority concedes, "a public corporation can count
as part of the State for some but not other purposes." *Ante*, at 494, n. 3
(internal quotation marks omitted). The Amtrak decisions, to continue

Remaining is the majority's unsupported—and insupportable—idea that the Secretary's plan "necessarily" hurts Missouri because it "impair[s]" MOHELA's "efforts to aid [the State's] college students." *Ante*, at 491. To begin with, it seems unlikely that the reduction in MOHELA's revenues resulting from the discharge would make it harder for students to "access student loans," as the majority contends. *Ante*, at 490. MOHELA is not a lender; it services loans others have made. Which is probably why even Missouri has never tried to show that the Secretary's plan will so detrimentally affect the State's borrowers. In any event—and more important—such a harm to citizens cannot provide an escape hatch out of MOHELA's legal and financial independence. That is because of another canonical limit on a State's ability to ride on third parties: A State may never sue the Federal Government based on its citizens' rights and interests. See *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U. S. 592, 610, n. 16 (1982); *Haaland* v. *Brackeen*, 599 U. S. 255, 294–295, and n. 11 (2023). Or said more technically, a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Ibid.*; see *Massachusetts* v. *Mellon*, 262 U. S. 447, 485–486 (1923). So Missouri cannot get standing by asserting that a harm to MOHELA will harm the State's citizens. Missouri needs to show that the harm to MOHELA produces harm to the State itself. And because, as explained above, MOHELA was set up (as corporations typically are) to insulate its creator from such derivative harm, Missouri is incapable of making that showing. See *supra*, at 526–527. The separateness, both financial and legal, between MOHELA and Missouri makes MOHELA alone the proper party.

The author of today's opinion once wrote that a 1970s-era standing decision "became emblematic" of "how utterly ma-

---

borrowing the majority's language, "said nothing about, and had no reason to address, whether an injury to [a] public corporation was a harm to the [Government]." *Ibid.*

nipulable" this Court's standing law is "if not taken seriously as a matter of judicial self-restraint." *Massachusetts*, 549 U. S., at 548 (ROBERTS, C. J., dissenting). After today, no one will have to go back 50 years for the classic case of the Court manipulating standing doctrine, rather than obeying the edict to stay in its lane. The majority and I differ, as I'll soon address, on whether the Executive Branch exceeded its authority in issuing the loan cancellation plan. But assuming the Executive Branch did so, that does not license this Court to exceed its own role. Courts must still "function as courts," this one no less than others. *Ibid.* And in our system, that means refusing to decide cases that are not really cases because the plaintiffs have not suffered concrete injuries. The Court ignores that principle in allowing Missouri to piggy-back on the "legal rights and interests" of an independent entity. *Warth*, 422 U. S., at 499. If MOHELA wanted to, it could have brought this suit. It declined to do so. Under the non-manipulable, serious version of standing law, that would have been the end of the matter—regardless how much Missouri, or this Court, objects to the Secretary's plan.

## II

The majority finds no firmer ground when it reaches the merits. The statute Congress enacted gives the Secretary broad authority to respond to national emergencies. That authority kicks in only under exceptional conditions. But when it kicks in, the Secretary can take exceptional measures. He can "waive or modify any statutory or regulatory provision" applying to the student-loan program. § 1098bb(a)(1). And as part of that power, he can "appl[y]" new "terms and conditions" "in lieu of" the former ones. § 1098bb(b)(2). That means when an emergency strikes, the Secretary can alter, so as to cover more people, pre-existing provisions enabling loan discharges. Which is exactly what the Secretary did in establishing his loan forgiveness plan. The majority's contrary conclusion rests first on stilted tex-

tual analysis. The majority picks the statute apart piece by
piece in an attempt to escape the meaning of the whole. But
the whole—the expansive delegation—is so apparent that
the majority has no choice but to justify its holding on extra-
statutory grounds. So the majority resorts, as is becoming
the norm, to its so-called major-questions doctrine. And the
majority again reveals that doctrine for what it is—a way
for this Court to negate broad delegations Congress has ap-
proved, because they will have significant regulatory im-
pacts. Thus the Court once again substitutes itself for Con-
gress and the Executive Branch—and the hundreds of
millions of people they represent—in making this Nation's
most important, as well as most contested, policy decisions.

A

A bit of background first, to give a sense of where the
HEROES Act came from. In 1991 and again in 2002, Con-
gress authorized the Secretary to grant student-loan relief
to borrowers affected by a specified war or emergency. The
first statute came out of the Persian Gulf Conflict. It gave
the Secretary power to "waive or modify any statutory or
regulatory provision" relating to student-loan programs in
order to assist "the men and women serving on active duty
in connection with Operation Desert Storm." §§ 372(a)(1),
(b), 105 Stat. 93. The next iteration responded to the im-
pacts of the September 11 terrorist attacks. It too gave the
Secretary power to "waive or modify" any student-loan pro-
vision, but this time to help borrowers affected by the "na-
tional emergency" created by September 11. § 2(a)(1), 115
Stat. 2386.

With those one-off statutes in its short-term memory, Con-
gress decided there was a need for a broader and more dura-
ble emergency authorization. So in 2003, it passed the
HEROES Act. Instead of specifying a particular crisis,
that statute enables the Secretary to act "as [he] deems neces-
sary" in connection with any military operation or "national
emergency." § 1098bb(a)(1). But the statute's greater cov-

erage came with no sacrifice of potency. When the law's emergency conditions are satisfied, the Secretary again has the power to "waive or modify any statutory or regulatory provision" relating to federal student-loan programs. *Ibid.*

Before turning to the scope of that power, note the stringency of the triggering conditions. Putting aside military applications, the Secretary can act only when the President has declared a national emergency. See § 1098ee(4). Further, the Secretary may provide benefits only to "affected individuals"—defined as anyone who "resides or is employed in an area that is declared a disaster area . . . in connection with a national emergency" or who has "suffered direct economic hardship as a direct result of a . . . national emergency." §§ 1098ee(2)(C)–(D). And the Secretary can do only what he determines to be "necessary" to ensure that those individuals "are not placed in a worse position financially in relation to" their loans "because of" the emergency. § 1098bb(a)(2). That last condition, said more simply, requires the Secretary to show that the relief he awards does not go beyond alleviating the economic effects of an emergency on affected borrowers' ability to repay their loans.

But if those conditions are met, the Secretary's delegated authority is capacious. As in the prior statutes, the Secretary has the linked power to "waive or modify any statutory or regulatory provision" applying to the student-loan programs. § 1098bb(a)(1). To start with the phrase after the verbs, "the word 'any' has an expansive meaning." *United States* v. *Gonzales*, 520 U. S. 1, 5 (1997). "Any" of the referenced provisions means, well, any of those provisions. And those provisions include several relating to student-loan cancellation—more precisely, specifying conditions in which the Secretary can discharge loan principal. See §§ 1087, 1087dd(g); 34 CFR §§ 682.402, 685.212 (2022). Now go back to the twin verbs: "waive or modify." To "waive" means to "abandon, renounce, or surrender"—so here, to eliminate a regulatory requirement or condition. Black's Law Dictionary 1894 (11th ed. 2019). To "modify" means "[t]o make

somewhat different" or "to reduce in degree or extent"—so here, to lessen rather than eliminate such a requirement. *Id.*, at 1203. Then put the words together, as they appear in the statute: To "waive or modify" a requirement means to lessen its effect, from the slightest adjustment up to eliminating it altogether. Of course, making such changes may leave gaps to fill. So the statute says what is anyway obvious: that the Secretary's waiver/modification power includes the ability to specify "the terms and conditions to be applied in lieu of such [modified or waived] statutory and regulatory provisions." §1098bb(b)(2). Finally, attach the "waive or modify" power to all the provisions relating to loan cancellation: The Secretary may amend, all the way up to discarding, those provisions and fill the holes that action creates with new terms designed to counteract an emergency's effects on borrowers.

Before reviewing how that statutory scheme operated here, consider how it might work for a hypothetical emergency that the enacting Congress had in the front of its mind. As noted above, a precursor to the HEROES Act was a statute authorizing the Secretary to assist student-loan borrowers affected by September 11. See *supra*, at 534. The HEROES Act, as Congress designed it, would give him the identical power to address similar terrorist attacks in the future. So imagine the horrific. A terrorist organization sets off a dirty bomb in Chicago. Beyond causing deaths, the incident leads millions of residents (including many with student loans) to flee the city to escape the radiation. They must find new housing, probably new jobs. And still their student-loan bills are coming due every month. To prevent widespread loan delinquencies and defaults, the Secretary wants to discharge $10,000 for the class of affected borrowers. Is that legal? Of course it is; it is exactly what Congress provided for. The statutory preconditions are met: The President has declared a national emergency; the Secretary's proposed relief extends only to "affected individuals"; and the Secretary has deemed the action "necessary to en-

sure" that the attack does not place those borrowers "in a
worse position" to repay their loans. §1098bb(a). And the
statutory powers of waiver and modification give the Secre-
tary the means to offer the needed assistance. He can, for
purposes of this special loan forgiveness program, scratch
the pre-existing conditions for discharge and specify differ-
ent conditions met by the affected borrowers. That is what
the congressionally delegated powers are *for*. If the Secre-
tary did not use them, Congress would be appalled.

The HEROES Act applies to the COVID loan forgiveness
program in just the same way. Of course, Congress did not
know COVID was coming; and maybe it wasn't even thinking
about pandemics generally. But that is immaterial, because
Congress delegated broadly, for all national emergencies. It
is true, too, that the Secretary's use of the HEROES Act
delegation has proved politically controversial, in a way that
assistance to terrorism victims presumably would not. But
again, that fact is irrelevant to the lawfulness of the program.
If the hypothetical plan just discussed is legal, so too is this
real one. Once more, the statutory preconditions have been
met. The President declared the COVID pandemic a "na-
tional emergency." §1098ee(4); see 87 Fed. Reg. 10289
(2022). The eligible borrowers all fall within the law's defi-
nition of "affected individual[s]." §1098ee(2); see *supra*, at
535. And the Secretary "deem[ed]" relief "necessary to en-
sure" that the pandemic did not put low- and middle-income
borrowers "in a worse position" to repay their loans.
§§1098bb(a)(1)–(2).[2] With those boxes checked, the Secre-

------

[2] More specifically, the Secretary determined that without a loan dis-
charge, borrowers making less than $125,000 are likely to experience
higher delinquency and default rates because of the pandemic's economic
effects. See App. 234–242, 257–259. In a puzzling footnote, the majority
expresses doubt about that finding, though says that its skepticism plays
no role in its decision. See *ante*, at 500, n. 6. Far better if the majority
had ruled on that alternative ground. Then, the Court's invalidation of
the Secretary's plan would not have neutered the statute for all future
uses. But in any event, the skepticism is unwarranted. All the majority
says to support it is that the current "paus[e]" on "interest accrual and

tary's waiver/modification powers kick in. And the Secretary used them just as described in the hypothetical above. For purposes of the COVID program, he scratched the conditions for loan discharge contained in several provisions. See App. 261–262 (citing §§ 1087, 1087dd(g); 34 CFR §§ 682.402, 685.212). He then altered those provisions by specifying different conditions, which opened up loan forgiveness to more borrowers. So he "waive[d]" and "modif[ied]" pre-existing law and, in so doing, applied new "terms and conditions" "in lieu of" the old. §§ 1098bb(a)(1), (b)(2); see 87 Fed. Reg. 61514. As in the prior hypothetical, then, he used his statutory emergency powers in the manner Congress designed.

How does the majority avoid this conclusion? By picking the statute apart, and addressing each segment of Congress's authorization as if it had nothing to do with the others. For the first several pages—really, the heart—of its analysis, the majority proceeds as though the statute contains only the word "modify." See *ante*, at 494–496. It eventually gets around to the word "waive," but similarly spends most of its time treating that word alone. See *ante*, at 496–498. Only when that discussion is over does the majority inform the reader that the statute also contemplates the Secretary's addition of new terms and conditions. See *ante*, at 498–499. But once again the majority treats that authority in isolation, and thus as insignificant. Each aspect of the Secretary's authority—waiver, modification, replacement—is kept sealed in a vacuum-packed container. The way they connect and

loan repayments" could achieve the same end. *Ibid.* But the majority gives no reason for concluding that the pause would work just as well to ensure that borrowers are not "placed in a worse position financially in relation to" their loans because of the COVID emergency. § 1098bb(a)(2)(A). How could it possibly know? And in any event, the majority's view of the statute would also make the pause unlawful, as later discussed. See *infra*, at 541. So the availability of the pause can hardly provide a basis for the majority's questioning of the Secretary's finding that cancellation is necessary.

reinforce each other is generally ignored. "Divide to conquer" is the watchword. So there cannot possibly emerge "a fair construction of the whole instrument." *McCulloch* v. *Maryland*, 4 Wheat. 316, 406 (1819). The majority fails to read the statutory authorization right because it fails to read it whole. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 167–169 (2012) (discussing the importance of the whole-text—here, really, the whole-sentence—canon).

The majority's cardinal error is reading "modify" as if it were the only word in the statutory delegation. Taken alone, this Court once stated, the word connotes "increment" and means "to change moderately or in minor fashion." *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 225 (1994). But no sooner did the Court say that much than it noted the importance of "contextual indications." *Id.*, at 226; see Scalia & Garner 167 ("Context is a primary determinant of meaning"). And in the HEROES Act, the dominant piece of context is that "modify" does not stand alone. It is one part of a couplet: "waive or modify." The first verb, as discussed above, means eliminate—usually the most substantial kind of change. See *supra*, at 535; accord, *ante*, at 498. So the question becomes: Would Congress have given the Secretary power to wholly eliminate a requirement, as well as to relax it just a little bit, but nothing in between? The majority says yes. But the answer is no, because Congress would not have written so insane a law. The phrase "waive or modify" instead says to the Secretary: "Feel free to get rid of a requirement or, short of that, to alter it to the extent you think appropriate." Otherwise said, the phrase extends from minor changes all the way up to major ones.

The majority fares no better in claiming that the phrase "waive or modify" somehow limits the Secretary's ability "to *add* to existing law." *Ante*, at 500 (emphasis in original). The majority's explanation of that idea oscillates a fair bit.

At times the majority tries to convey that "additions" as a class are somehow suspect. See *ante*, at 498–499 (looking askance at "add[ing] new terms," "adding back in," "filling the empty space," "augment[ing]," and "draft[ing] new" language). But that is mistaken. Change often (usually?) involves or necessitates replacements. So when the Secretary uses his statutory power to remove some conditions on loan cancellation, he can under that same power replace them with others. The majority itself must ultimately concede that point. See *ante*, at 495, 499. So it falls back on arguing that the "additions" allowed cannot be "substantial[ ]" because the statute uses the word "modify." *Ante*, at 498; see *ante*, at 499–500. But that just doubles down on the majority's most basic error: extracting "modify" from the "waive or modify" phrase in order to confine the Secretary to making minor changes. As just shown, the phrase as a whole says the opposite—tells the Secretary that he can make changes along a spectrum, from modest to substantial. See *supra*, at 539. And so he can make additions along that spectrum as well. In particular, if he entirely removes existing conditions on loan discharge, he can substitute new ones; he does not have to leave gaping holes.

Indeed, other language in the statute makes that substitution authority perfectly clear. As noted earlier, the statute refers expressly to "the terms and conditions to be applied in lieu of such [modified or waived] statutory and regulatory provisions." § 1098bb(b)(2); see *supra*, at 536. In other words, the statute expects the Secretary's waivers and modifications to involve replacing the usual provisions with different ones. The majority rejoins that the "in lieu of" language is a "wafer-thin reed" for the Secretary to rely on because it appears in a "humdrum reporting requirement." *Ante*, at 499. But the adjectives are by far the best part of that response. It is perfectly true that the language instructs the Secretary to "include" his new "terms and conditions" when he provides notice of his "waivers or modifica-

tions." §1098bb(b)(2). But that is because the statute contemplates that there will be new terms and conditions to report. In other words, the statute proceeds on the premise that the usual waiver or modification will, contra the majority, involve adding "new substantive" provisions. *Ante*, at 499. The humdrum reporting requirement thus confirms the expansive extent of the Secretary's waiver/modification authority.

The majority's opposing construction makes the Act inconsequential. The Secretary emerges with no ability to respond to large-scale emergencies in commensurate ways. The creation of any "novel and fundamentally different loan forgiveness program" is off the table. *Ante*, at 496. So, for example, the Secretary could not cancel student loans held by victims of the hypothetical terrorist attack described above. See *supra*, at 536–537. That too would involve "the introduction of a whole new regime" by way of "draft[ing] new substantive" conditions for discharging loans. *Ante*, at 499–500. And under the majority's analysis, new loan *forbearance* policies are similarly out of bounds. When COVID struck, Secretary DeVos immediately suspended loan repayments and interest accrual for all federally held student loans. See *ante*, at 486. The majority claims it is not deciding whether that action was lawful. *Ante*, at 499, n. 5. Which is all well and good, except that under the majority's reasoning, how could it not be? The suspension too offered a significant new benefit, and to an even greater number of borrowers. (Indeed, for many borrowers, it was worth much more than the current plan's $10,000 discharge.) So the suspension could no more meet the majority's pivotal definition of "modify"—as make a "minor change[ ]"—than could the forgiveness plan. *Ante*, at 495. On the majority's telling, Congress thought that in the event of a national emergency financially harming borrowers—under a statute gearing potential relief to the measure of that harm, so that affected borrowers end up no less able to repay their loans—

the Secretary can do no more than fiddle. He can, the majority says, "reduc[e] the number of tax forms borrowers are required to file." *Ibid.* Or he can "waive[ ] the requirement that a student provide a written request for a leave of absence." *Ante,* at 497. But he can do nothing that would ameliorate an emergency's economic impact on student-loan borrowers.

That is not the statute Congress wrote. The HEROES Act was designed to deal with national emergencies—typically major in scope, often unpredictable in nature. It gave the Secretary discretionary authority to relieve borrowers of the adverse impacts of many possible crises—as "necessary" to ensure that those individuals are not "in a worse position financially" to make repayment. §1098bb(a)(2). If all the Act's triggers are met, the Secretary can waive or modify the usual provisions relating to student loans, and substitute new terms and conditions. That power extends to the varied provisions governing loan repayment and discharge. Those provisions are, indeed, the most obvious candidates for alteration under a statute drafted to leave borrowers no worse off, in relation to their loans, than before an emergency struck. But the majority will not accept the statute's meaning. At every pass, it "impos[es] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania*, 591 U. S. ——, —— (2020). It refuses to apply the Act in accordance with its terms. Explains the majority: "However broad the meaning of 'waive or modify' "—meaning however much power Congress gave the Secretary—this program is just too large. *Ante,* at 500.

B

The tell comes in the last part of the majority's opinion. When a court is confident in its interpretation of a statute's text, it spells out its reading and hits the send button. Not this Court, not today. This Court needs a whole other chap-

ter to explain why it is striking down the Secretary's plan. And that chapter is not about the statute Congress passed and the President signed, in their representation of many millions of citizens. It instead expresses the Court's own "concerns over the exercise of administrative power." *Ante*, at 501. Congress may have wanted the Secretary to have wide discretion during emergencies to offer relief to student-loan borrowers. Congress in fact drafted a statute saying as much. And the Secretary acted under that statute in a way that subjects the President he serves to political accountability—the judgment of voters. But none of that is enough. This Court objects to Congress's permitting the Secretary (and other agency officials) to answer so-called major questions. Or at least it objects when the answers given are not to the Court's satisfaction. So the Court puts its own heavyweight thumb on the scales. It insists that "[h]owever broad" Congress's delegation to the Secretary, it (the Court) will not allow him to use that general authorization to resolve important issues. The question, the majority helpfully tells us, is "who has the authority" to make such significant calls. *Ibid.* The answer, as is now becoming commonplace, is this Court. See, *e. g.*, *West Virginia*, 597 U. S. ——; *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. —— (2021); see also *Sackett* v. *EPA*, 598 U. S. 651 (2023) (using a similar judicially manufactured tool to negate statutory text enabling regulation).

The majority's stance, as I explained last Term, prevents Congress from doing its policy-making job in the way it thinks best. See *West Virginia*, 597 U. S., at —– – ——, —— – —— (dissenting opinion). The new major-questions doctrine works not to better understand—but instead to trump—the scope of a legislative delegation. See *id.*, at ——. Here is a fact of the matter: Congress delegates to agencies often and broadly. And it usually does so for sound reasons. Because agencies have expertise Congress lacks. Because

times and circumstances change, and agencies are better able to keep up and respond. Because Congress knows that if it had to do everything, many desirable and even necessary things wouldn't get done. In wielding the major-questions sword, last Term and this one, this Court overrules those legislative judgments. The doctrine forces Congress to delegate in highly specific terms—respecting, say, loan forgiveness of certain amounts for borrowers of certain incomes during pandemics of certain magnitudes. Of course Congress sometimes delegates in that way. But also often not. Because if Congress authorizes loan forgiveness, then what of loan forbearance? And what of the other 10 or 20 or 50 knowable and unknowable things the Secretary could do? And should the measure taken—whether forgiveness or forbearance or anything else—always be of the same size? Or go to the same classes of people? Doesn't it depend on the nature and scope of the pandemic, and on a host of other foreseeable and unforeseeable factors? You can see the problem. It is hard to identify and enumerate every possible application of a statute to every possible condition years in the future. So, again, Congress delegates broadly. Except that this Court now won't let it reap the benefits of that choice.

And that is a major problem not just for governance, but for democracy too. Congress is of course a democratic institution; it responds, even if imperfectly, to the preferences of American voters. And agency officials, though not themselves elected, serve a President with the broadest of all political constituencies. But this Court? It is, by design, as detached as possible from the body politic. That is why the Court is supposed to stick to its business—to decide only cases and controversies (but see *supra*, at 524–533), and to stay away from making this Nation's policy about subjects like student-loan relief. The policy judgments, under our separation of powers, are supposed to come from Congress and

the President. But they don't when the Court refuses to respect the full scope of the delegations that Congress makes to the Executive Branch. When that happens, the Court becomes the arbiter—indeed, the maker—of national policy. See *West Virginia*, 597 U. S., at —— (KAGAN, J., dissenting) ("The Court, rather than Congress, will decide how much regulation is too much"). That is no proper role for a court. And it is a danger to a democratic order.

The HEROES Act is a delegation both purposive and clear. Recall that Congress enacted the statute after passing two similar laws responding to specific crises. See *supra*, at 534. Congress knew that national emergencies would continue to arise. And Congress decided that when they did, the Secretary should have the power to offer relief without waiting for another, incident-specific round of legislation. Emergencies, after all, are emergencies, where speed is of the essence. For similar reasons, Congress replicated its prior (two-time) choice to leave the scope and nature of the loan relief to the Secretary, so that he could respond to varied conditions. As the House Report noted, Congress provided "the authority to implement waivers" that were "not yet contemplated" but might become necessary to deal with "any unforeseen issues that may arise." H. R. Rep. No. 108–122, pp. 8–9 (2003). That delegation is at the statute's very center, in its "waive or modify" language. And the authority it grants goes only to the Secretary—the official Congress knew to hold the responsibility for administering the Government's student-loan portfolio and programs. See § 1082. Student loans are in the Secretary's wheelhouse. And so too, Congress decided, relief from those loan obligations in case of emergency. That delegation was the entire point of the HEROES Act. Indeed, the statute accomplishes nothing else.

The majority is therefore wrong to say that the "indicators from our previous major questions cases are present here."

*Ante*, at 504 (internal quotation marks omitted). Compare
the HEROES Act to other statutes containing broad dele-
gations that the same majority has found to raise major-
questions problems. Last Term, for example, the majority
thought the trouble with the Clean Power Plan lay in the
EPA's use of a "long-extant" and "ancillary" provision ad-
dressed to other matters. *West Virginia*, 597 U. S., at ——.
Before that, the majority invalidated the CDC's eviction
moratorium because the agency had asserted authority far
outside its "particular domain." *Alabama Assn. of Real-
tors*, 594 U. S., at ——. I thought both those decisions wrong.
But assume the opposite; there is, even on that view, nothing
like those circumstances here. (Or, to quote the majority
quoting me, those "case[s are] distinguishable from this one."
*Ante*, at 505.) In this case, the Secretary responsible for car-
rying out the student-loan programs forgave student loans in
a national emergency under the core provision of a recently
enacted statute empowering him to provide student-loan re-
lief in national emergencies.[3] Today's decision thus moves

---

[3] The nature of the delegation here poses a particular challenge for JUS-
TICE BARRETT, given her distinctive understanding of the major-questions
doctrine. In her thoughtful concurrence, she notes the "importance of
*context* when a court interprets a delegation to an administrative agency."
*Ante*, at 508 (emphasis in original). I agree, and have said so; there are,
indeed, some significant overlaps between my and JUSTICE BARRETT's
views on properly contextual interpretation of delegation provisions. See
*West Virginia*, 597 U. S., at —— – —— (dissenting opinion). But then con-
sider two of the contextual factors JUSTICE BARRETT views as "telltale
sign[s]" of whether an agency has exceeded the scope of a delegation.
*Ante*, at 518. First, she asks, is there a "mismatch[ ]" between a "backwa-
ter provision" or "subtle device" and an agency's exercise of power?
*Ante*, at 517–518. And second, is the agency official operating within or
"outside [his] wheelhouse"? *Ante*, at 518. Here, for the reasons stated
above, there is no mismatch: The broadly worded "waive or modify" dele-
gation IS the HEROES Act, not some tucked away ancillary provision.
And as JUSTICE BARRETT agrees, "this is not a case where the agency is
operating entirely outside its usual domain." *Ante*, at 521. So I could
practically rest my case on JUSTICE BARRETT's reasoning.

the goalposts for triggering the major-questions doctrine. Who knows—by next year, the Secretary of Health and Human Services may be found unable to implement the Medicare program under a broad delegation because of his actions' (enormous) "economic impact." *Ante*, at 502.

To justify *this* use of its heightened-specificity requirement, the majority relies largely on history: "[P]ast waivers and modifications," the majority argues, "have been extremely modest." *Ante*, at 501. But first, it depends what you think is "past." One prior action, nowhere counted by the majority, is the suspension of loan payments and interest accrual begun in COVID's first days. That action cost the Federal Government over $100 billion, and benefited many more borrowers than the forgiveness plan at issue. See *supra*, at 541. And second, it's all relative. Past actions were more modest because the precipitating emergencies were more modest. (The COVID emergency generated, all told, over $5 *trillion* in Government relief spending.) In providing more significant relief for a more significant emergency—or call it unprecedented relief for an unprecedented emergency—the Secretary did what the HEROES Act contemplates. Imagine asking the enacting Congress: Can the Secretary use his powers to give borrowers more relief when an emergency has inflicted greater harm? I can't believe the majority really thinks Congress would have answered "no." In any event, the statute Congress passed does not say "no." Delegations like the HEROES Act are designed to enable agencies to "adapt their rules and policies to the demands of changing circumstances." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 157 (2000). Congress allows, and indeed expects, agencies to take more serious measures in response to more serious problems.

Similarly unavailing is the majority's reliance on the controversy surrounding the program. Student-loan cancellation, the majority says, "raises questions that are personal and emotionally charged," precipitating "profound debate

across the country." *Ante*, at 503–504. I have no quarrel with that description. Student-loan forgiveness, and responses to COVID generally, have joined the list of issues on which this Nation is divided. But that provides yet more reason for the Court to adhere to its properly limited role. There are two paths here. One is to respect the political branches' judgments. On that path, the Court recognizes the breadth of Congress's delegation to the Secretary, and declines to interfere with his use of that granted authority. Maybe Congress was wrong to give the Secretary so much discretion; or maybe he, and the President he serves, did not make good use of it. But if so, there are political remedies— accountability for all the actors, up to the President, who the public thinks have made mistakes. So a political controversy is resolved by political means, as our Constitution requires. That is one path. Now here is the other, the one the Court takes. Wielding its judicially manufactured heightened-specificity requirement, the Court refuses to acknowledge the plain words of the HEROES Act. It declines to respect Congress's decision to give broad emergency powers to the Secretary. It strikes down his lawful use of that authority to provide student-loan assistance. It does not let the political system, with its mechanisms of accountability, operate as normal. It makes itself the decisionmaker on, of all things, federal student-loan policy. And then, perchance, it wonders why it has only compounded the "sharp debates" in the country? *Ante*, at 503.

## III

From the first page to the last, today's opinion departs from the demands of judicial restraint. At the behest of a party that has suffered no injury, the majority decides a contested public policy issue properly belonging to the politically accountable branches and the people they represent. In saying so, and saying so strongly, I do not at all "disparage[ ]" those who disagree. *Ante*, at 507. The majority is

KAGAN, J., dissenting

right to make that point, as well as to say that "[r]easonable minds" are found on both sides of this case. *Ibid.* And there is surely nothing personal in the dispute here. But Justices throughout history have raised the alarm when the Court has overreached—when it has "exceed[ed] its proper, limited role in our Nation's governance." *Supra*, at 521. It would have been "disturbing," and indeed damaging, if they had not. *Ante*, at 506. The same is true in our own day.

The majority's opinion begins by distorting standing doctrine to create a case fit for judicial resolution. But there is no such case here, by any ordinary measure. The Secretary's plan has not injured the plaintiff-States, however much they oppose it. And in that respect, Missouri is no different from any of the others. Missouri does not suffer any harm from a revenue loss to MOHELA, because the two entities are legally and financially independent. And MOHELA has chosen not to sue—which of course it could have. So no proper party is before the Court. A court acting like a court would have said as much and stopped.

The opinion ends by applying the Court's made-up major-questions doctrine to jettison the Secretary's loan forgiveness plan. Small wonder the majority invokes the doctrine. The majority's "normal" statutory interpretation cannot sustain its decision. The statute, read as written, gives the Secretary broad authority to relieve a national emergency's effect on borrowers' ability to repay their student loans. The Secretary did no more than use that lawfully delegated authority. So the majority applies a rule specially crafted to kill significant regulatory action, by requiring Congress to delegate not just clearly but also micro-specifically. The question, the majority maintains, is "who has the authority" to decide whether such a significant action should go forward. *Ante*, at 501; see *supra*, at 543. The right answer is the political branches: Congress in broadly authorizing loan

relief, the Secretary and the President in using that author-ity to implement the forgiveness plan. The majority instead says that it is theirs to decide.

So in a case not a case, the majority overrides the com-bined judgment of the Legislative and Executive Branches, with the consequence of eliminating loan forgiveness for 43 million Americans. I respectfully dissent from that decision.

Page Proof Pending Publication

REPORTER'S NOTE

   The attached opinion has been revised to reflect the usual publication
and citation style of the United States Reports.  The revised pagination
makes available the official United States Reports citation in advance of
publication.  The syllabus has been prepared by the Reporter of Decisions
for the convenience of the reader and constitutes no part of the opinion of
the Court.  A list of counsel who argued or filed briefs in this case, and
who were members of the bar of this Court at the time this case was
argued, has been inserted following the syllabus.  Other revisions may
include adjustments to formatting, captions, citation form, and any errant
punctuation.  The following additional edits were made:

p. 477, line 8 from bottom, "as the COVID–19 pandemic came to its end"
   is changed to "a few weeks before President Biden stated that 'the
   [COVID–19] pandemic is over'"